2022 IL App (2d) 200195
No. 2-20-0195
Opinion filed June 30, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-1655 |
| OLVAN QUEZADA, | ) ) | Honorable James K. Booras, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant, Olvan Quezada, was convicted of attempted murder of a police officer (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014)), aggravated discharge of a firearm (*id.* § 24-1.2(a)(3)), unlawful possession of a firearm by a street gang member (*id.* § 24-1.8(a)(1)), and possession of a defaced firearm (*id.* § 24-5(b)). Defendant's posttrial motion was denied. On December 16, 2019, the court sentenced defendant to 27 years' imprisonment and, on March 4, 2020, denied defendant's motion to reconsider the sentence. Defendant appeals. For the following reasons, we reverse defendant's convictions and remand for a new trial on all counts except unlawful possession of a firearm by a street gang member.

¶ 2                              I. BACKGROUND

¶ 3     For context, we summarize that, in the early morning hours of June 17, 2016, police arrived at the Briarwood apartment complex in Waukegan to address a domestic dispute. After that dispute was resolved, while police officer John Szostak was writing a report, a gunshot was fired (the first shooting). Additional officers arrived on the scene to investigate the gunshot, and then more shots were fired in the officers' direction (the second shooting). Police later arrested defendant and Dominic Longmire, after a gun was found underneath a couch cushion at Longmire's apartment, where defendant had been sleeping. Defendant was ultimately charged with crimes stemming from the second shooting.

¶ 4                                   A. Trial

¶ 5                            1. Shootings and Arrests

¶ 6     On June 17, 2016, at around 1:48 a.m., Szostak responded to a domestic call at 3055 Arthur Court in the Briarwood apartment complex. Jonathan Cardona (Hispanic), William Servin (Hispanic), and Longmire (African-American) were present, as well as Elise Salas (Cardona's fiancé) and some of Cardona's family members. Defendant was also present before police were called but had left by the time Szostak arrived. After the domestic dispute was resolved, Cardona agreed to leave the apartment with Servin and Longmire. Szostak returned to his car to write his report and then, around 2:25 a.m., he heard two gunshots. He saw Cardona, Servin, and Longmire running, and he ordered them to stop. Servin and Cardona ultimately complied, although Longmire ran away. When Cardona walked over and put up his hands, a spent shell casing fell from him. Servin and Cardona were handcuffed and put in separate squad cars. A bit later, Szostak heard several more gunshots. He saw a subject running westbound. Later, he arrived at Longmire's apartment and identified him as the third subject who had been with Cardona and Servin, but who

had run away from him. Szostak testified that he never saw defendant at the domestic call; no mention was made to him about a gun being there.

¶ 7 Salas testified that Cardona was her fiancé and she lived with him on June 17, 2016. On that date, there was a gathering in Cardona's apartment with Cardona, Servin, Longmire, and defendant present. She did not know defendant; he was already there when she arrived home from work. Salas and Cardona's mother thought defendant "was a little bit off" and was looking at people strangely. Someone passed around a gun, but Salas could not recall who took out the gun or who put it away. "Everybody" held the gun at some point. After a fight broke out between Cardona and his sister, the police were called, although defendant left before they were called. The police spoke with the family, and Cardona left with Longmire and Servin. Afterwards, Salas heard a gunshot and ran outside; she saw Cardona and Servin running and then being stopped by police and put in a squad car. She then heard a second round of gunshots. At the police station and at trial, Salas identified lineup photographs of Cardona, Servin, Longmire, and defendant, as well as a picture of a gun that looked like the one passed around the apartment. She had written on the picture that a man who looked like "Wolverine," *i.e.*, defendant, took the gun out of his back pocket. Although, at trial, she could not recall seeing defendant leave the apartment, she wrote in her police statement, "[a]s soon as Wolverine Man had heard my in-laws on the phone with 9-1-1, he had ran [*sic*] out the door taking the gun with him."

¶ 8 Detective Brian Maschek testified that he arrived at the Briarwood apartment complex around 2:35 a.m. Other officers were already on the scene, and Cardona and Servin had already been placed in the back of separate squad cars. Maschek was tasked with processing evidence, specifically, a fired bullet casing that had fallen from Cardona's T-shirt and was found on the pavement. Maschek testified that, while he and the two other officers huddled around the bullet

casing, "that's when I began to hear I guess I heard somebody yell, 'F*** the police,' " followed by five gunshots. He did not hear someone yell, "I'm going to shoot." Maschek heard a whistling sound and felt a projectile going over his head, and he and the other officers took cover. According to Maschek, the shots sounded as though they came from the west, near the complex's pool. Maschek ultimately recovered and processed four cartridges and fired bullet casings, three in the grass near the pool area and one in the parking lot. The bullets that hit parked vehicle windshields did not appear to have been fired from a weapon being shot straight up into the air; rather, they appeared to have been fired in a horizontal trajectory.

¶ 9    Officer Angela Divirgilio testified that she heard yelling prior to the shots and that the shots seemed to come from the northwest, near the basketball court and the pool (although on cross-examination she agreed that she did not see exactly from where they came). After the shots, she saw someone in that area running in a white top, "maybe a tank top."

¶ 10    Officer Jason Lau also heard shouting prior to the shots, but he did not hear what was said, and, while he was "pretty convinced" that the shots came from the west, the buildings and the parking lot created "kind of a funnel" and the shots could have been coming from anywhere. Further, "the radio traffic kind of muddied things up because everybody was saying different things about where they thought the shots were coming from."

¶ 11    Detective Christopher Llenza and Sergeant John Spiewak were at the scene around 2:45 a.m., after the second shooting, and they stood near a dumpster and a fence on the northeast corner of the complex's property line, looking down the south and west perimeters in case any suspects ran from the presumed location of the shots to the north or east. They were trying to be quiet as they looked around, and then they heard a man talking. A man pulled up on the fence with both hands and peeked his head over it. Spiewak shined his flashlight on the man and identified himself

as a police officer, and the man said "s***" and ran east toward Green Bay Road. Both officers identified defendant as the person who looked over the fence and ran from them. They tried to chase defendant as he ran north toward another apartment complex; the path and the grounds were wet and swampy. Llenza and Spiewak later went to Longmire's apartment, where they identified defendant as the person who had been on the fence and ran away. Defendant was wearing the same clothes as before, including a dark shirt, and the bottom of his jeans was wet and covered with grass.

¶ 12    After processing evidence at the shooting scene, Maschek was also asked to collect items at 322 North Green Bay Road, in an apartment belonging to Longmire and his mother. There, a .9-mm Keltec semiautomatic handgun was recovered underneath a couch cushion. The weapon's serial number was defaced. In addition, Maschek was directed to two pairs of tennis shoes—white and red Nike Air Jordans, wet with debris and mud on them, and purple and black Nikes, also wet. Further, in the bathroom, one wet sock and gray sweatpants were on the floor in front of a sink vanity and, on the vanity, there was an open bottle of liquid soap or body wash and dirt around the sink.

¶ 13    Officer Michael Sliozis testified that he collected video evidence from the crime scene. Specifically, he collected and reviewed a video retrieved from a security camera that was mounted on a maintenance shed near the pool. The camera pointed north and recorded, around the relevant time, a person raising his left arm. Sliozis testified that he had been a police officer for 16 years and it appeared that the person on camera held a gun. Sliozis also testified that the video showed dust falling, which could signify multiple gunshots disrupting and causing dust to "shake off" near the camera area. The video did not have any audio, so it did not record the sound of gunshots. The video was admitted without objection and published to the jury. Sliozis also helped process, book,

and collect evidence from defendant. The evidence he collected included white Nike shoes, blue jeans, and a shirt. Sliozis testified that he collected from defendant a white shirt, although the State later referred to it as a black Nike T-shirt and confirmed with Sliozis that he collected from defendant the same black Nike T-shirt that is seen in the security video. Defendant did not have a firearm owners identification (FOID) card on him.

¶ 14 Longmire's mother, Tara Longmire, testified that she lives with Longmire and his brother. On June 17, 2016, around 3 a.m., Longmire came home with a young Hispanic male. She did not know the man, had never seen him before, did not know his name, and could not identify him at trial. When she entered the room, the man was already sitting on a two-cushion love seat. Although she said that the man could not stay and offered to drive him home to Zion, the two men were not ready to leave. Tara ultimately went to bed. When the police arrived, they searched the house and found a gun. Tara testified that she does not own a gun and had never seen the gun before; she was "shocked" to see the gun. She identified photo exhibits of the two-cushion love seat, as well as the gun on the love seat underneath the couch cushion.

¶ 15                    2. Longmire's Testimony and Interrogation

¶ 16 Longmire testified that he had a recent robbery conviction. On June 17, 2016, he went to Cardona's apartment and Servin and defendant were there. He testified that, on that night, he had known defendant for only a few months and knew him only as "O," not "Hombre." Defendant left Cardona's apartment prior to the police arriving. After the domestic dispute was resolved, Longmire left Cardona's apartment alone and started to walk home. About halfway there, he heard a gunshot. He tried calling Cardona and defendant, but did not reach them, so he went back to the apartment complex and saw Cardona and Servin being handcuffed. Longmire then walked to the pool area (near a maintenance shed, sidewalk, basketball court, and field) and met up with

defendant to take defendant home to Zion. When they were walking on a path near a flagpole, defendant was in front of Longmire; defendant pointed a gun in the air and shot it. Longmire did not get a close look at the gun, but he realized it was a gun when it went off. Longmire stated that he was not sure if it was "an accidental discharge" and that defendant "did not say he was going to shoot that guy." Longmire was worried and said, "[O]h, we got to go home. We got to get you home, *** come with me ***." Longmire did not want defendant to get in trouble. He and defendant ran to Longmire's apartment, and defendant brought the gun inside. Longmire has never brought a gun into his mother's home, nor did she keep guns there. Longmire's mother was going to take defendant home, but they fell asleep. Police arrived and arrested them; after a gunshot residue test was performed, Longmire was interviewed. He did not recall referring to defendant as "Hombre" during the interview. Nor did he recall which officers interviewed him and which showed him photo lineups. "It was so long ago." Longmire verified the identifications he made from the photo lineups, including one on which he circled a picture of defendant, initialed it, and wrote, "shot his pistol. I know him from mutual friends, D-L." Longmire said that he was scared and that officers coerced him.

¶ 17    On cross-examination, Longmire testified that he heard one shot and that defendant did not say anything before firing the weapon. Longmire testified that he saw defendant pull the trigger with the gun pointing in the air, although not straight up. Longmire did not recall exactly where they were standing when defendant fired the gun, but he did not recall being able to see the police from where they were standing. Longmire agreed with defense counsel that, during his interrogation, he tried to tell the truth but the detective interrupted him numerous times and pressed him to tell a certain story. He agreed with counsel's statement, "[a]nd then you started to tell the truth, and they would interrupt you and tell you that's not the truth. That's not what we need to

hear?" Further, Longmire agreed that, when there were questions he could not answer, the detectives "filled in the blanks" for him with what they wanted him to say. He noted that, during the interrogation, he twice told detectives that he wished to speak to an attorney, but they did not get one. One detective told him, "if we think you are lying, I take this all away and can have you charged with attempted murder, have everybody charged with attempted murder." Further, a detective said, "[i]f I were you sitting in that chair, I would tell you whatever I want to hear to get out of that chair." They told Longmire that, if he did not tell them everything that happened, his mother could lose her apartment. Longmire testified that the detectives "basically threatened" him. Although he originally told them that he did not see a gun, the shooting, or "Hombre" shoot anything, they showed him photo lineups and told him to write on the picture of the gun that "Hombre" shot the gun. He wrote that statement after the detectives badgered him to say what they wanted him to write. "They didn't want to hear that you hadn't seen the gun that night, and you didn't see anybody shoot; did they?" He answered, "no." Counsel continued, "[i]n fact, when you first entered the interview, you told them I didn't see any gun. I didn't see any shooting, correct." Longmire answered, "yes." He reiterated that he told the detectives that defendant did *not* say, "F*** the police," before shooting, and "I thought like that was very wrong. I'm going to tell the truth about that, you know. Anybody could maybe say I'm a liar, you know, but I'm going to tell the truth about that." In sum, defense counsel questioned Longmire about numerous things he said during the interrogation and the police tactics used therein.

¶ 18    On redirect, Longmire agreed that his interrogation was video recorded. In addition, he confirmed that he did not know who was responsible for the first shooting, because he was nowhere near the shooter, but that, for the second shooting, he was by defendant. Longmire also agreed that

he changed his story and some of the details "a little bit here and there" during the interrogation. Finally, he repeated that he never heard defendant say, "F*** the police."

¶ 19    Longmire's interrogation consisted of two interviews conducted in two rooms at the police station. The recordings of those two interviews were published to the jury, with no objection, after the conclusion of Longmire's testimony and after one of the interviewing detectives, sergeant Elias Agalianos, testified that he had watched the videos and they were accurate. The videos were redacted only to remove "dead time," when Longmire was in the room but not actively being interviewed. The unredacted portions of the videos consisted of approximately 90 minutes of interviews by Agalianos and detective George Valko and approximately 12 minutes depicting other officers showing Longmire photo lineups.

¶ 20    In the videos, which this court has reviewed, Longmire was not wearing a shirt, socks, or shoes, although he had a blanket wrapped around his torso for most of the interview. In sum, in the videos, Longmire was the first person to mention defendant and did so by referring to him as "Hombre," a reference he repeated throughout the duration of the interview. Initially, Longmire "glossed over" the night's events, denied having seen a gun or a shooting, and claimed that he went home after leaving Cardona's apartment. The detectives rejected Longmire's story, accused him of being dishonest, and urged him to be truthful because they had already spoken to other officers and persons in custody and knew the "whole story." At times, Agalianos loudly raised his voice. The detectives explained that someone told them that Longmire was at the shooting and saw who was responsible. The detectives discussed Longmire's status as a "Shorty" and advised him that covering for gang members would only get him in trouble and would elevate his involvement in the crimes from low to very high. The detectives stated that, unless he cooperated and was truthful, he could be charged with attempted murder and lose his jobs and his mom could lose her

house. They told Longmire that defendant was doing the "right thing" and that they did not think that Longmire was the shooter but that, if he kept lying, he could be charged with everything. Ultimately, Longmire told the detectives that defendant fired the shots, and they responded, "you are not the first person who told us this." After repeated questioning, Longmire stated that, before firing, defendant said that he was going to shoot at the police. Longmire repeatedly denied that defendant said, "F\*\*\* the police."

¶ 21    After the jury had reviewed the videos, Agalianos resumed his testimony concerning Longmire's interrogation. He explained that, before starting the interrogation, he had spoken with other officers about Cardona, Servin, and Longmire and, at some point, they obtained information regarding a fourth individual, "a male Hispanic, approximately five-seven, five-eight with a blown out hairstyle is the way it was described. He was wearing a black shirt, had tattoos, I believe blue jeans." Longmire and defendant arrived at the station, and, around 7:30 a.m., Agalianos and Valko commenced Longmire's interrogation. Agalianos explained his approach to interviewing a suspect when he believes the suspect is being untruthful, including raising his voice and impressing upon the suspect the seriousness of the situation. He likened it to yelling at one's child when the child is untruthful and the parent wishes to impress upon the child the severity of the situation. On cross-examination, when asked whether Longmire changed his story "about 10 different times," Agalianos explained that, "[t]hrough the process, yes, he started to give up more information pertaining to the incident, yes." He agreed that Valko told defendant that, "if I were you, I would tell you whatever I want to hear to get out of that chair," although Agalianos said that the statement could mean several things, depending on how it is interpreted. Counsel asked, "and shortly after that, you raised your voice and told [Longmire], 'if we think you're lying, I can have you charged with everything, including attempted murder,' " and he replied, "Correct. I wanted him to realize

- 10 -

how serious it was and what the consequences potentially could be, yes." He agreed that he told Longmire that he could be charged with attempted murder and that his mother could potentially lose her house. He also agreed that, on occasion, when Longmire started to say something that Agalianos did not want to hear or did not believe was the truth, he would interrupt Longmire to say "no" and that he wanted something different.

¶ 22                                    3. Gang Evidence

¶ 23    Detective Rigoberto Amaro has been a police officer for more than 18 years and is a detective in the Waukegan Police Department's gang intelligence unit. He works on gang and narcotics investigations, as well as shootings and violent crimes. Around 4 a.m. on June 17, 2016, he arrived at the police station and was briefed on the facts of this investigation. At the time, Servin and Cardona were both in custody, and Amaro interviewed Servin. He then spoke with Agalianos to compare what they were learning. A bit later, defendant and Longmire were brought into the station. Amaro performed gunshot residue testing on defendant and observed that the bottom of his pants and shoes were wet, grassy, and muddy. Further, Amaro noticed that defendant had a tattoo on his arm and a "blowout style haircut," as well as a fresh cut on his right palm.

¶ 24    Amaro testified that he is proficient in understanding the gangs in and around Waukegan, as he has been dealing "with that" for more than 11 years. Amaro has been qualified as an expert witness with respect to gangs a "few times" and, when the State moved to tender Amaro as an expert in gangs, the court replied, "[Defense counsel] is shrugging his shoulders. Therefore, I'll declare the witness as an expert in his field." Amaro testified that he is familiar with Servin and that this case was his first contact with Cardona. He interviewed Servin, observed defendant, and reviewed the reports and videos of other interviews. Based on those things, Amaro opined that defendant is affiliated with the Spanish Gangster Disciples street gang.

¶ 25    On cross-examination, defense counsel asked Amaro whether he had any conversations with defendant about gang membership. Amaro replied, "Your client didn't wish to talk to me." Defense counsel then asked whether Amaro was basing his opinion solely on what other people told him about defendant, and Amaro explained that he saw a "cover-up" tattoo, *i.e.*, one that covers up a previous tattoo, on defendant's right arm. "I noticed that he was covering up another street gang on his arm, and when I asked him if he was a member of the Serrano Street Gang, he didn't answer me." The examination continued:

"Q: So other than hearsay from other people and a coverup of what you think was a prior gang, do you have any other independent knowledge that he was active in a different gang at that time?

A: Well, he was with other members of the street gang, and during the course of this investigation, William Servin was introducing [defendant] *to other people* as Shorty Folks which is a street term used to describe a young member or a person that's affiliated with the Folks Nation street gang.

Q: Okay. But I said other than other people saying something to you, do you have any independent knowledge other than somebody else saying that?

A: No." (Emphasis added.)

¶ 26    On redirect examination, the State asked Amaro whether street gang members introduce people as being in their gang if they are not, in fact, in the gang. Amaro responded in the negative and added that, if someone is in the same gang, then he or she might be introduced as "Folks or Kings or whatever this person is a member of." Amaro agreed that Servin had introduced defendant as "Shorty Folks." Defense counsel objected to the foundation, asking when and where the statements about defendant were allegedly made. The court sustained the objection but noted that

an expert can base his or her opinion on any information that he or she has been given. The State continued its examination by confirming with Amaro that gang members take gang participation seriously and would not lightly introduce people as being in the gang. The State further confirmed that Amaro was of the opinion that defendant was in the Spanish Gangster Disciples street gang:

"Q: All right. Now, you said the word Folks, Shorty Folks. What's Folks?

A: Folks is the Folks nation. There's two nations in the Midwest area. You've got the People nation and the Folk nation. Underneath each nation, you have multiple street gangs. So you have like the Maniac Latin Disciples, Spanish Gangster Disciples, Satan Disciples, Spanish Cobras, City Knights. All of these gangs are under the Folk nation, and there's many more street gangs.

Under the People nation, you have the Insane Unknowns, Latin Kings, Vicelords, Four Corner Hustlers, P. Stones. These are all street gangs that are under the People nation, and they all ride under the five. The Folk nation ride under number six.

So if you were to have like an Insane Unknown and a King together and you had a bunch of rival gang members, these two would protect each other because they fall under the same nation as opposed to the Folks nation.

Q: All right. So the Spanish Gangster Disciples are under the Folks nation?

A: Correct, and it's not uncommon for them to address each other as Folks. Hey, what's up Folks? What's up, Folks? Sometimes they don't even know each other, they're just introduced. That's my Folks right there and introduce each other that way or that's Folks, he's letting somebody know that, you know, he's one of us.

Q: And what is a shorty?

A: A shorty is a young gang member who has a—you know, like started off in a gang and *really hasn't been around that much*. They'll call him a shorty.

Q: Kind of like a gang apprentice?

A: Yes." (Emphasis added.)

¶ 27                    4. Other Evidence, Jury Instructions, Verdict

¶ 28    The gunshot residue expert testified that he tested swabs taken from defendant and Longmire. Both tested negative for gunshot residue. He explained, however, that residue may be washed off and that the lack of residue does not, therefore, conclusively mean that a person did not fire a weapon. The firearm expert testified that the fired casings and bullets recovered from both the first and second shootings were fired from the same weapon and that the weapon was the firearm recovered in this case. A forensic scientist with DNA expertise was unable to obtain sufficient DNA from the firearm or the magazine to compare it to defendant, Longmire, Cardona, and Servin. Similarly, no fingerprints on the firearm or the magazine were suitable for comparison.

¶ 29    After the State rested, defendant moved for a directed verdict. The court denied the motion. Defendant then rested, presenting no evidence. Defendant renewed his motion for a directed verdict, noting that the indictment alleged two counts referring to "Sarah" Divirgilio but only "Angela" Divirgilio testified. Also, he argued that the gang evidence was "very weak." The court granted defendant's motion for a directed verdict as to the two counts that referred to Sarah Divirgilio.

¶ 30    In closing arguments, the State noted, in part, that "Maschek clearly says he heard 'F*** the police' " before the shots were fired. It also noted that, given the security video showing defendant with a weapon and Longmire meeting up with defendant; the cartridge casings in that location, which were fired from the weapon found where defendant was sleeping; and the wet

shoes, clothes, and dirt found at Longmire's apartment, it had presented sufficient evidence to convict, even without Longmire's testimony and interrogation video.

¶ 31     In his closing argument, defense counsel attacked Longmire's credibility. Defense counsel reviewed with the jury the interrogation tactics police used on Longmire, frequently referring to the videos that the jury had viewed. Counsel noted that the detectives "wrenched" information from Longmire, "spoon-fed" him until he said what they wanted, threatened him, and did not accept his story when they did not like it. Counsel commented, "[w]atch that video carefully because it's kind of horrifying to see what two experienced detectives who've been doing it 18 years, I want to say 20 years, they know how to manipulate a witness." Counsel referenced Longmire's comments at the end of the video, the changes in his story after they changed interview rooms and after the detectives left him alone in the room to consider what he wanted to tell them, the way the detectives ignored Longmire's requests for an attorney, and how they pressed on with the questioning over time and with increasing threats until they got what they wanted. Further, counsel argued to the jury that the video showed the detectives

> "[t]rying to push towards this intent to shoot the police officers that Agalianos kept saying didn't he say f*** the police? Did you hear somebody say f*** the police? He said about 50 times no, I didn't hear that. And he said about 30 times I didn't hear anything else except I'm going to shoot. Well, who's going to yell, hey, I'm going to shoot right before they do? I mean that whole interview with [Longmire] is a lie, all right?"

¶ 32     After closing arguments, the jury did *not* receive an instruction concerning accomplice-witness testimony. It was instructed, however, that it was to determine the credibility of witnesses, considering various factors, including any interest or bias the witness may have:

"Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his age, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case." Illinois Pattern Jury Instructions, Criminal, No. 1.02 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 1.02).

Further, the jury was instructed on witness believability, which pertains to a witness's prior inconsistent statements:

"The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind ordinarily may be considered by you only for the limited purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom.

However, you may consider a witness's earlier inconsistent statement as evidence without this limitation when the statement narrates, describes, or explains an event or condition the witness had personal knowledge of; and the statement was accurately recorded by a tape recorder, videotape, recording, or a similar electronic means of sound recording.

It is for you to determine what weight should be given to that statement. In determining the weight to be given to an earlier statement, you should consider all of the circumstances under which it was made." IPI Criminal 4th No. 3.11.

¶ 33    On October 18, 2019, the jury found defendant guilty on all counts.

¶ 34                    B. Posttrial Motions and Sentencing

¶ 35    On October 28, 2019, defendant filed *pro se* a petition for postconviction relief. It does not appear that the petition was resolved. However, on December 16, 2019, defense counsel made an oral motion for a new trial, arguing that the evidence was insufficient to sustain defendant's guilt. The court denied the motion.

¶ 36    On December 16, 2019, the court sentenced defendant to 27 years' imprisonment (concurrent terms of 27 years for attempted murder, 19 years for aggravated discharge of a firearm, 10 years for unlawful possession of a weapon by a gang member, and 5 years for possession of a defaced firearm). On February 20, 2020, defendant moved to reconsider the sentence, which the court denied on March 4, 2020. Defendant appeals.[1]

¶ 37                                     II. ANALYSIS

¶ 38            A. Ineffective Assistance of Counsel: Accomplice-Witness Instruction

¶ 39    Defendant argues first that he received ineffective assistance of trial counsel, where counsel failed to request that the jury be given Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.17), the accomplice-witness jury instruction. Defendant notes that Longmire testified that he was near defendant at the time of the shooting, fled with defendant, tried to help defendant escape, hid defendant in his home, and was threatened with charges by police. As such, defendant contends, Longmire could have been indicted either as a principal or under an accountability theory, rendering defendant entitled to

---

[1]On May 7, 2020, defendant moved this court to establish jurisdiction or, in the alternative, for leave to file a late notice of appeal, based upon the timing of defense counsel's filing of the motion to reconsider the sentence in relation to the imposition of the sentence. On May 13, 2020, we granted defendant leave to file a late notice of appeal.

have IPI Criminal No. 3.17 provided to the jury. Defendant asserts that "the accomplice[-]witness instruction should be given any time the totality of the evidence and the reasonable inferences therefrom establish probable cause to believe that the witness participated in the crime as either a principal or under a theory of accountability" and that the instruction is critical because it warns the jury that the witness may have a strong motivation to provide false testimony for the State. Given Longmire's testimony about his presence during and after the crime, defendant suggests that Longmire was not charged with attempted murder or possession of a firearm only because he told police what they wanted to hear. In addition, defendant contends that the instruction would have given the jury guidance on how to critically evaluate the testimony and statements referenced throughout the trial by Salas, Cardona, and Servin. Defendant argues that counsel's failure to request the instruction was unreasonable, for there is no sound strategic reason for his failure to request that the jury be instructed to view Longmire's testimony with suspicion. In addition, he concludes that counsel's failure prejudiced him, because Longmire's testimony was vital to the State's case, yet the jury was not warned about his strong incentive to testify against defendant. We disagree.

¶ 40    Defendant requests that we review this issue for plain error, because it was not raised posttrial. See, *e.g.*, *People v. Enoch*, 122 Ill. 2d 176, 187 (1988) (failure to include an issue in a posttrial motion results in forfeiture of that issue on appeal). We may address a forfeited issue when an error is plain and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" (prong one) or (2) the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence" (prong two). *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *People v. Herron*, 215 Ill. 2d 167, 178-79

(2005).[2] The first step in a plain-error analysis is to determine whether a "plain error" occurred. See *Piatkowski*, 225 Ill. 2d at 564-65. In this context, the word "plain" is synonymous with "clear" and is equivalent to "obvious." *Id.* at 565 n.2.

¶ 41 Claims of ineffective assistance of counsel are analyzed by using the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail, a defendant must show that counsel's performance was deficient and that the deficient performance was prejudicial. *Id.* Prejudice is demonstrated where a defendant shows that a reasonable probability exists that, but for counsel's deficient performance, the result of the trial would have been different. See *People v. Enis*, 194 Ill. 2d 361, 376 (2000). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The failure to establish either *Strickland* prong precludes a finding of ineffective assistance of counsel. See *People v. Henderson*, 2013 IL 114040, ¶ 11. Here, we conclude that defendant cannot establish either deficient performance or prejudice to succeed on his ineffective-assistance claim (or, therefore, plain error).

¶ 42 The accomplice-witness instruction provides:

"When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." IPI Criminal No. 3.17.

_____

[2]It is not clear that plain-error analysis is necessary, as we generally review *de novo* claims of ineffective assistance that were not raised before the trial court. See, *e.g.*, *People v. Hunt*, 2016 IL App (2d) 140786, ¶ 51. In any event, for the reasons outlined below, we conclude that defendant's ineffective-assistance claim fails, which is also fatal to any plain-error analysis.

¶ 43    The test for determining whether a witness is an accomplice, such that a defendant is entitled to have IPI Criminal No. 3.17 given to the jury, is " 'whether there is probable cause to believe that [the witness] was guilty either as a principal, or on the theory of accountability.' " *People v. Cobb*, 97 Ill. 2d 465, 476 (1983) (quoting *People v. Robinson*, 59 Ill. 2d 184, 191 (1974)); see also *People v. Hunt*, 2016 IL App (2d) 140786, ¶ 52 ("The instruction should be given if the totality of the evidence and the reasonable inferences derived from the evidence establish probable cause to believe that the witness participated in the crime, as either a principal or an accomplice."). That is, the evidence must show that there is probable cause to believe that the witness was not merely present " 'and failed to disapprove of the crime, but that he participated in the planning or commission.' " *People v. Kirchner*, 194 Ill. 2d 502, 541 (2000) (quoting *People v. Henderson*, 142 Ill. 2d 258, 315 (1990)). Under certain circumstances, trial counsel may render ineffective assistance by failing to tender IPI Criminal No. 3.17. See, *e.g.*, *People v. Wheeler*, 401 Ill. App. 3d 304, 314 (2010); *People v. Campbell*, 275 Ill. App. 3d 993, 999 (1995).

¶ 44    Here, as there was no probable cause to believe that Longmire was an accomplice, trial counsel's failure to request the accomplice-witness jury instruction was not unreasonable. As the State notes, IPI Criminal No. 3.17 states that it may be applicable "[w]hen a witness says he was involved in the commission of a crime with the defendant," and, here, the evidence overall reflected that Longmire was merely present with defendant when the shots were fired. It is true that Longmire also testified that he ran home with defendant and planned to help defendant return to Zion. However, the evidence did not suggest that Longmire participated in planning or committing the shooting itself. He did not, in fact, drive defendant to Zion, and, later, when police arrived, Longmire largely cooperated with them. While the detectives told Longmire that he could be charged "with everything" if he did not cooperate, this was a police tactic meant as a warning

and as a means of gathering information; it was not, for example, an offer of immunity or leniency from the State in exchange for testimony. No charges were brought against Longmire. Further, there was additional evidence that tied defendant to the shooting and/or reflected that Longmire was *not* the shooter. For example, the security video showed an individual with a weapon before the first shooting, and that person was not Longmire. A spent shell casing was found in that area, and it was fired from the same weapon that fired the gunshots in the second shooting. It was, thus, reasonable to infer that the same person used the same gun in both shootings, and that gun was found under the couch cushion on which, according to both Tara and Longmire, defendant had been sitting. Thus, there was no probable cause to believe that Longmire was a principal or an accomplice in the shooting, and counsel's failure to request the instruction was not unreasonable.

¶ 45    In any event, even if trial counsel's failure to request IPI Criminal No. 3.17 was objectively unreasonable, its absence did not prejudice defendant and, so, he cannot establish ineffective assistance of counsel. "Failure to request a particular jury instruction may be grounds for finding ineffective assistance of counsel, only if the instruction was so 'critical' to the defense that its omission 'den[ied] the right of the accused to a fair trial.' " *People v. Rodriguez*, 387 Ill. App. 3d 812, 828 (2008) (quoting *People v. Pegram*, 124 Ill. 2d 166, 174 (1988)). Again, the accomplice-witness instruction directs the jury that it should carefully consider the witness's testimony with suspicion, caution, and in light of all evidence. See *Hunt*, 2016 IL App (2d) 140786, ¶ 52 ("The [purpose of the accomplice-witness instruction] is to warn the jury that the witness might have a strong motivation to provide false testimony for the State in exchange for immunity or some other lenient treatment."). Here, the jury was acutely aware that Longmire's testimony should be closely

scrutinized.[3] Indeed, even in the absence of the accomplice-witness instruction, counsel impressed upon the jury that it should view Longmire's testimony with heightened suspicion and warned of numerous circumstances that might motivate Longmire to provide false testimony. Counsel thoroughly attacked the credibility of Longmire's testimony during cross-examination and in closing argument. Counsel emphasized that Longmire's story changed numerous times and was the product of coercive police interrogation tactics, and he argued to the jury that Longmire was the *only* person who claimed to know who the real shooter was, stating:

> "For all we know, [Longmire] could have had a gun. [Longmire] could have had the gun, right? But we don't know. By the way, who said well, let's come back to my house? [Longmire]. Who was the one that told you, oh, he was sleeping on that couch? [Longmire]. [Longmire's mom]. *** but you didn't hear anybody else say that this guy was found sleeping on that couch. It's only from Dominic Longmire's mom who said that."

Longmire's credibility was so thoroughly attacked that, in closing argument, the State minimized Longmire's importance, informing the jury that, even without him, it had sufficient evidence to convict.

---

[3]We note that we reject defendant's argument that the jury also needed the instruction to properly consider Salas's testimony and statements by Cardona and Servin. Salas clearly did not qualify as an accomplice. Even if she held the gun when it was being passed around, without possessing a FOID card, those actions had nothing to do with the second shooting. And the instruction pertains to *testimony*; neither Cardona nor Servin testified, nor were any written statements from them introduced at trial.

¶ 46　In *Hunt*, our court addressed a similar issue by following *People v. McCallister*, 193 Ill. 2d 63, 90 (2000), where our supreme court held that, even though trial counsel did not request the accomplice-witness instruction, the defendant failed to establish a reasonable probability that the trial would have resulted differently had the instruction been given. See *Hunt*, 2016 IL App (2d) 140786, ¶ 54. The *McCallister* court based its conclusion on (1) the inherent weaknesses of the defendant's own testimony, (2) the strength of the evidence offered against the defendant apart from the accomplice witness's testimony, and (3) the instructions the jury received. *Id.* (citing *McCallister*, 193 Ill. 2d at 91). Here, the first factor is irrelevant, as defendant did not testify. The second factor we discussed above, concluding that there was sufficiently strong evidence offered against defendant apart from Longmire's testimony. As to the third factor, the jury here received the pattern instructions for both general witness credibility (IPI Criminal 4th No. 1.02) and witness believability in light of a prior inconsistent statement (IPI Criminal 4th No. 3.11). While these instructions *alone* do not cure the failure to request the accomplice-witness instruction (*Hunt*, 2016 IL App (2d) 140786, ¶ 60), "the fact that the jury was told to consider, in general, the bias, interest or prejudice of the witnesses may be considered as one factor, *among others*, which establishes that [the] defendant was not prejudiced by his trial counsel's failure to tender the accomplice witness instruction." (Emphasis in original.) *McAllister*, 193 Ill. 2d at 97. Given that the jury received those instructions, coupled with all the evidence and trial counsel's thorough attack on Longmire's credibility, there is no reasonable probability that the jury would have reached a different verdict had it also received IPI Criminal No. 3.17.

¶ 47　Defendant's cited cases do not persuade us otherwise. In *People v. Fane*, 2021 IL 126715, ¶ 43, our supreme court discussed when the instruction should be given but did so in holding that the trial court did not err in *giving* the instruction. Further, in both *Wheeler* and *Campbell*, for

example, the courts found that trial counsel was ineffective for failing to request accomplice-witness instructions; but, in both cases, the accomplices, who were given immunity or leniency, provided essentially the sole evidence identifying the defendants as the perpetrators of the offenses. See *Wheeler*, 401 Ill. App. 3d at 313-14 (where the witness drove the defendant to the scene, was present at the scene, drove the defendant away from the scene, was aware that police were attempting to contact him and actively avoided them, and received immunity in exchange for his testimony); *Campbell*, 275 Ill. App. 3d at 998-99 (the defendant was identified as the perpetrator only by two accomplices, who both testified in exchange for deals with the State); see also *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 32 (defense counsel's failure to submit the accomplice-witness instruction prejudiced the defendant, because the accomplice was testifying under a grant of use immunity and his testimony was the only evidence establishing the defendant's participation in the crime). We agree with defendant that formal deals are not the only relevant form of leniency. However, and as noted by the court in *Hunt*, in those cases and unlike here, the juries did not receive IPI Criminal 4th No. 3.11, and those trials did not include repeated assertions (by both parties) that the juries should question the alleged accomplices' credibility.

¶ 48    Here, as previously noted and as argued by the State in closing, although Longmire testified that he was the sole witness to the shooting, evidence tied defendant to the shooting *even without Longmire's testimony*. Defendant alleges that the evidence was not overwhelming, because it was a chaotic scene, police were unsure where the gunshots game from, a shell casing was found on Cardona, there was purportedly a male in a white shirt who was never identified, only four shell casings were found when there were allegedly five gunshots, no DNA or other physical evidence tied defendant to the crime, and Longmire was allegedly the only eyewitness. Yet, the jury was able to review the security video and determine for itself whether the individual seen on the video

was defendant and whether he was holding a gun. Regardless of the casing found on Cardona, he could *not* have been responsible for the second shooting, as he and Servin were handcuffed and in separate squad cars at that time. The casings found on the scene near the maintenance shed, where it appeared that defendant stood and raised a gun, and by the pool area were fired from the gun found where defendant was allegedly sleeping. Officers testified that they saw defendant look over the fence and flee from them, and the area through which he ran was swampy and wet. Wet, muddy shoes were found in Longmire's apartment, with dirt and soap on the bathroom console, and defendant's jeans were wet and grassy.

¶ 49    In sum, defendant also cannot establish a reasonable probability that, if the jury had received the accomplice-witness instruction, the result of the trial would have been different. Defendant's ineffective-assistance claim fails.

¶ 50                    B. Longmire's Interrogation Videos

¶ 51    Next, defendant argues that it was error to admit the unredacted, nearly two-hour long videos of Longmire's interrogation as substantive evidence or for impeachment. Defendant asserts that Longmire's interrogation videos were not inconsistent with his trial testimony about the second shooting and, further, that they contained a "motherload" of inadmissibility, such as improper layers of hearsay, police narrative and opinions on defendant's guilt, and inflammatory gang references. He asserts that, because it was not inconsistent with his trial testimony, Longmire's recorded statement was an improper use of a consistent statement to bolster the credibility of a key State witness. Defendant notes that the State relied upon the videos "extensively" in closing argument and that the jurors were instructed that they could consider the videos substantively. Further, he notes, the recorded statement was not *inconsistent*, as Longmire was not a "turncoat" witness for the State. Even if it were inconsistent, defendant continues, the

State laid no foundation to introduce the inconsistent statement and, even if it had, introduction of only the inconsistent portions of the videos would be proper. Thus, he argues, the State used the interrogation videos merely to bolster Longmire's testimony and to introduce a "treasure-trove" of inadmissible, prejudicial information.

¶ 52    Defendant also asserts that most of the interrogation videos should have been redacted because they contained improper hearsay and the detectives' narrative about their conversations with other people, comments about what those people said, and opinions on defendant's guilt and who was being truthful. For example, he notes that, when Longmire told the detectives that defendant shot the gun, they responded "you are not the first person who told us this," which the jury could have understood meant that other witnesses corroborated Longmire's story. This, among other comments, he contends, implied that the detectives knew that defendant was guilty, which invaded the province of the jury. Also, Longmire made comments that were not from personal knowledge or lacked foundation and the detectives made references to their interviews with defendant, such as "[Hombre] is doing the right thing," which implied that they interviewed defendant and, since he was charged and Longmire was not, he must have incriminated himself. Defendant reiterates that this was not *his* interrogation, but, rather, a witness's interrogation, and that witness had already testified at trial that defendant was the shooter. Indeed, he notes, the State did not play the videos during Longmire's testimony; rather, it introduced the videos *after* he testified, akin to the process that might be used with a video of the interrogation of a defendant. He contends that the videos here "offered the police's concise, coherent theory of the case and what they believed happened the night of the shooting. It was not to merely show how it affected Longmire." Defendant argues that there is no reasonable trial strategy for not objecting to the admission of the videos and not requesting that they be redacted. He contends that trial counsel's

use of the videos in closing to point out the police manipulation did not justify using the entirety of the videos. Instead, defendant asserts, counsel could have used "snippets" or "gone about it the old-fashion[ed] way, *** and asked the witness did the police say this to you or did the police threaten you and so forth, using the video[s] to either impeach an answer or refresh recollection."

¶ 53    Finally, defendant points out that the videos contained numerous prejudicial, inflammatory references to gangs, including statements that Longmire admitted to being a "Shorty"; that Cardona, Servin, Longmire, and defendant were all gang members; that gangs go on missions, steal, and rob; and that Servin said Longmire was a "Shorty." Defendant contends that the strong prejudice against street gangs makes such evidence inadmissible unless there is sufficient proof that gang activity is related to the charged crime. Here, he asserts, the gang evidence was not relevant to the shooting.

¶ 54    In sum, defendant contends that (1) the admission of Longmire's entire interrogation was plain error under both prongs and (2) trial counsel's failure to object to the interrogation videos or request a redaction was ineffective assistance. He notes that counsel did not use any portion of the videos to attack the State's case. Rather, he allowed the devastating statements to go to the jury unchecked.

¶ 55    The State asserts that the interrogation videos were properly admitted for both impeachment purposes and as substantive evidence under section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2014)). It further contends, citing *People v. Theis*, 2011 IL App (2d) 091080, ¶ 32, that recorded conversations are not hearsay. Finally, it argues that the videos' probative value was not greatly outweighed by their prejudicial effect because they *aided* defendant's efforts to demonstrate that Longmire was not a credible witness and any gang references in the videos were not more prejudicial than probative because they were

relevant to the properly joined possession-of-a-weapon-by-a-gang-member charge. We disagree and conclude that the admission of the videos was clear error.

¶ 56     Again, the first step in a plain-error analysis is to determine whether a clear or obvious error occurred. See *Piatkowski*, 225 Ill. 2d at 564-65. Setting aside foundation, the State's position is that Longmire's testimony contained sufficient inconsistencies and vagueness such that he was clearly trying to distance himself from the police interview and cast doubt on the statements that he made to them. Yet, before the State introduced the videos, Longmire had already testified on direct examination that defendant possessed the gun and was the shooter; on redirect, he confirmed that he was near defendant during the second shooting. The State acknowledges that a party may not ordinarily impeach its own witness's credibility by introducing evidence of a prior inconsistent statement *unless* the witness's trial testimony affirmatively damages the impeaching party's case. See, *e.g.*, Ill. S. Ct. R. 238(a) (eff. Apr. 11, 2001) (a party may impeach its own witness with a prior inconsistent statement when the witness's testimony affirmatively damages that party's case); *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 46. In our view, while Longmire's testimony contained some inconsistencies from what he said in his interrogation, none of the inconsistencies or points upon which Longmire was vague or silent can be considered *affirmatively damaging* to the State's case. For example, the State notes that, at trial, Longmire (1) denied knowing that defendant went by the name "Hombre" or using that term in the interrogation (claiming the detectives used that term first), (2) was silent when asked if he told the detectives that he gave certain answers to protect his people, (3) denied telling the detectives that he met defendant by the woods, testifying that he met him by the pool, (4) did not recall whether he wrote the words "shot his pistol. I know him from mutual friends, D-L" on the photo lineup when he circled defendant's picture (although agreed he did, suggesting that he was coerced and the detectives told him what

to write), and (5) could not recall whether the officers who showed him the photo lineups were the same detectives who interviewed him. None of these points affirmatively damaged the State's case, as they were all collateral. Indeed, "[t]o be used as impeachment, a prior inconsistent statement must be *truly inconsistent* with the witness's trial testimony, and it must deal with a matter that is *more than collateral*." (Emphases added.) *People v. Murray*, 2017 IL App (2d) 150599, ¶ 57, *rev'd in part on other grounds*, 2019 IL 123289, ¶ 53. To be considered affirmatively damaging, as opposed to simply disappointing, the testimony must give "positive aid" to the other side and must be more damaging than a complete failure to testify would have been. *Id.* Longmire testified at trial that he was with defendant, defendant had a gun, and defendant fired the shots. It therefore strains credulity to suggest that introduction of the *entire* interrogation was appropriate because the State's case was so affirmatively damaged by the aforementioned "inconsistencies" that the State would have been better off had Longmire not testified at all. In fact, where Longmire had already testified that defendant was the shooter, it is somewhat surprising that the State wished to publish the interrogation, given that it largely verified the detectives' statements and tactics that defendant challenged, as well as Longmire's inconsistencies therein. Indeed, as the State concedes, the *defense* arguably stood to benefit from the videos, "especially since the videotape actually *aided* the defense's theory that Longmire was not a credible witness when the jury could see how many times he changed his story during the police interview." (Emphasis in original.) As Longmire's trial testimony was not so inconsistent that the State would have been better off without it, the interrogation videos should not have been admitted as impeachment evidence. And,

because they were not inconsistent, they should not have been admitted substantively under section 115-10.1.[4]

¶ 57 Nevertheless, we must reject defendant's plain-error argument. Again, once plain error is established, we must determine whether (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" (prong one) or (2) the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence" (prong two). *Piatkowski*, 225 Ill. 2d at 565. Here, concerning prong one, and for the reasons we described above in our resolution of the accomplice-witness instruction, the evidence was not so closely balanced that admitting the videos tipped the scales of justice against defendant. The evidence without the videos still would have left Longmire's testimony that he saw defendant commit the shooting. Moreover, even *without* Longmire's testimony, there was a video recording apparently depicting defendant with a gun, in an area where shell casings were found that matched other shell casings found at the scene, and there was a gun found in the apartment where defendant

---

[4]We note that, although the State accurately summarizes this court's holding in *Theis*, we do not find it helpful here because defendant is not arguing that the videos themselves or all of the detectives' statements therein were hearsay, nor is the issue the effect that their statements had on the listener, *i.e.*, Longmire, not defendant. Rather, and unlike in *Theis*, defendant's arguments concern, in part, that the videos contained statements made by persons not in the video and not subject to cross-examination at trial. Moreover, he contends that, again, unlike in *Theis*, the videos here were not needed to explain the police investigation or, as we explained above, to impeach Longmire after his testimony affirmatively damaged the State's case.

was sleeping. Officers identified defendant as fleeing from them through a swampy area, and wet shoes and jeans were discovered in defendant's presence.

¶ 58    As to prong two, defendant asserts that statements recorded in the videos, concerning other persons—such as Servin and Cardona—making statements to police, violated his right to confront witnesses, as those witnesses did not testify at trial. See, *e.g.*, *People v. Fillyaw*, 409 Ill. App. 3d 302, 319 (2011) (violations of due process and confrontation clause affect substantial rights and, accordingly, may constitute second-prong plain error). We disagree. Defendant points specifically to two occasions in the almost 90-minute-long interrogation videos where Cardona and Servin are mentioned, namely at minutes 35:03 and 36:00. During those occasions, however, the detectives discuss that Cardona and Servin told them that Longmire was with them when they went to a hotel before the first shooting, that Longmire was with defendant, and that Longmire was a "Shorty" trying to "come home," meaning trying to become part of a gang and participate in gang activities, such as robbing or stealing. In essence, their purported statements concerned *Longmire*. To the extent that the statements in the videos referenced defendant being present with Longmire, they were redundant to Longmire's own trial testimony. As such, we cannot agree that certain information in the interrogation videos so seriously impaired defendant's right to cross-examination that defendant's trial was unfair and the integrity of the judicial process compromised.

¶ 59    As to defendant's claim that trial counsel was ineffective for failing to object to the interrogation videos or request that they be redacted, we again must reject defendant's arguments. First, counsel clearly sought to discredit Longmire's testimony, and his decision not to object to the State's introduction of the videos could arguably have been strategy to emphasize Longmire's inconsistencies and the police interrogation tactics. As those tactics and the evolution of Longmire's story involved an ongoing exchange that took place over the course of the entire

interrogation, it would have been challenging for counsel to seek redaction of certain "snippets." Further, even if we accept that, because the videos were improperly admitted and counsel did not object to them, his performance *was* objectively unreasonable, defendant cannot demonstrate prejudice sufficient to undermine confidence in the outcome. Again, the videos arguably could have demonstrated to the jury that Longmire's story should not be trusted. But if not, and as we have stated above, there was adequate evidence absent the videos to convict defendant such that there is no reasonable probability that, but for the videos, the jury's verdict would have been different.

¶ 60    In sum, the error in admitting Longmire's videotaped interrogation is not, on its own, reversible in the plain-error or ineffective-assistance contexts.

¶ 61                          C. Gang Testimony and Severability

¶ 62    Next, defendant argues that the State used the charge of unlawful possession of a weapon by a street gang member (count VII) to introduce voluminous prejudicial gang evidence, although none of the remaining charges were gang related. Defendant contends that trial counsel was ineffective for not moving to sever the possession count to protect the integrity of the trial and so that the jurors, when deciding the more serious charges, would not have heard prejudicial gang evidence. Although he concedes that, under section 111-4(a) of the Code (725 ILCS 5/111-4(a) (West 2016)), the possession of a weapon by a gang member and shooting charges *could* initially be joined and a decision regarding severance is usually regarded as a matter of trial strategy, he contends that, under section 114-8 of the Code (*id.* § 114-8), the court may consider severance or other appropriate relief if joinder will prejudice a defendant. As such, defendant argues, had counsel moved to sever the possession of a weapon by a gang member charge, the jury would not

have had before it any references to gangs, or the stereotypes and prejudices that accompany gang membership, while it deliberated upon the most serious charges.

¶ 63    In addition, with respect to the gang evidence itself, defendant argues that it was overwhelmingly more prejudicial than probative, as the most serious charges had no gang-related motive attached to them and the jury was not given any guidance on how to consider the evidence or instructed that it applied to only one count. Further, defendant contends that Amaro's expert testimony lacked adequate foundation; contained improper hearsay about what others told him about defendant, without any determination of when or whether such information is reliable and of the type reasonably considered by experts in the field; and made no distinction between his testimony as an expert and his testimony concerning his role as an investigator who collected evidence to charge someone with attempted murder of a fellow officer. In addition, defendant argues that, as post-arrest silence is inadmissible, Amaro improperly referenced defendant's refusal to speak with him. In defendant's view, when defense counsel said to Amaro, "you didn't have any conversations with my client about that," Amaro should have simply answered, "no," instead of answering, "he didn't wish to talk to me." Further, Amaro noted that, when defendant was asked whether he was in a gang, he did not answer. Defendant concedes that counsel made no objections during or posttrial on these points. As such, defendant contends, (1) admission of the expert testimony was plain error under both prongs and (2) trial counsel was ineffective (a) by not moving to sever the possession charge, (b) by failing to object to Amaro's testimony, and (c) to the extent that counsel's questions opened the door to Amaro's statement that defendant refused to speak with him.

¶ 64    We appreciate defendant's concern about the gang evidence here. Frankly, as trial counsel argued in his motion for a directed verdict, the evidence was weak. As counsel pointed out during

Amaro's examination, Amaro's testimony lacked foundation establishing when and to whom Servin introduced defendant as "Shorty Folks." In fact, the court sustained defendant's objection on those grounds, but those questions remained unanswered. Amaro acknowledged that he had no independent knowledge of defendant's purported gang membership, other than what other people told him. He apparently further based his opinion, in part, on the fact that defendant sported a "cover-up" tattoo. However, there was no description of the tattoo itself and no indication of whether it paid homage to the Spanish Gangster Disciples or whether it "covered-up" an old tattoo that connected him to any specific gang, let alone the Spanish Gangster Disciples. Further, he did not explain why, when covering up a gang tattoo would imply leaving a gang or former membership, such an implication should be rejected here. Similarly, we note that Amaro testified that Servin had introduced defendant as "Shorty Folks," but then, after a long narrative describing gang nations and listing numerous gangs purportedly in the area (which was arguably more prejudicial than probative), Amaro defined a "Shorty" as someone who might have started off in a gang and "really hasn't been around that much." A failure to "be around much," coupled with a cover-up tattoo, could suggest *no* gang membership, and there was nothing beyond this evidence to tie defendant to the Spanish Gangster Disciples. Amaro explained that defendant wore a "blowout" hairstyle, but he never explained how that hairstyle likely reflected gang membership. Further, although Amaro explained that he works in the gang investigation unit and has testified as an expert witness a "few times," he never testified that the evidence upon which he relied in forming his opinions is the type that is typically considered by experts to evaluate a suspect's gang membership. See, *e.g.*, *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 115 (expert testimony requires foundation establishing that the information upon which the expert relied is reliable and is the type reasonably relied upon by experts in the same field). Amaro apparently based his

opinion on his interview with Servin, Servin's comment, made "during the course of this investigation," that he had introduced defendant as "Shorty Folks" at some unknown time (although it is not clear to whom Servin introduced defendant or to whom he made that comment), investigation reports (it is not clear whose specific investigation reports or what was in those reports concerning defendant's gang membership) and video interviews of other people involved in the case, defendant's cover-up tattoo, and defendant's failure to answer when asked if he was in a gang. But Amaro did not testify that the information he relied upon is the type typically relied upon by experts assessing gang membership, nor did he apparently rely upon, for example, objective information, such as databases maintained by the police gang investigation unit, prior contacts, or other similar factors that could indicate gang membership. The State argues that, simply by virtue of Amaro being accepted as an expert in gangs, the court could determine that the information Amaro provided was reliable, "because it was reasonably relied upon in [*sic*] experts in that particular field to form opinions or inferences on the subject of gangs (*i.e.*, Detective Amaro said that he had been qualified as an expert witness in gang affiliation in the past)." Assuming we properly understand this argument, we reject it. The fact that Amaro testified as a gang expert "a few times" in the past, where we do not know the substance of that testimony or the factors he used to form his opinions in those cases, does not *ipso facto* mean that he relied on appropriate factors *here*. Finally, as discussed in the next section, the State failed to establish that the Spanish Gangster Disciples *was* a street gang, as that term is defined by statute. See 720 ILCS 5/24-1.8(a)(1) (West 2016); 740 ILCS 147/10 (West 2016).

¶ 65    However, even if the introduction of the gang evidence was clear error, such that counsel's failure to move for severance or object was unreasonable, our review is constrained by the fact that both plain-error and ineffective-assistance analyses require our consideration of the *remaining*

evidence to determine whether, but for the error, the result of the trial would have been different. Without question, gang-membership evidence may be strongly prejudicial. See, *e.g.*, *People v. Strain*, 194 Ill. 2d 467, 477 (2000). Perhaps the gang-membership evidence influenced the jury's decision to convict defendant of attempted murder of a police officer rather than simply aggravated discharge of a firearm. However, we cannot conclude that the evidence *overall* was so closely balanced that the errors pertaining to gang evidence tipped the scales against defendant (prong-one plain error). Nor can we conclude that the result of the trial would have been different but for counsel's failures to (1) move for severance or (2) object to Amaro's testimony. Even if there was no gang evidence at trial, the evidence against defendant remained sufficient to sustain the jury's verdict. As previously noted, the evidence against defendant included a security video appearing to show him with a weapon, the location of spent shell casings, officers identifying him as peering over a fence and then fleeing from them, his wet shoes and jeans tying him to the swampy area where he fled, the presence of the gun that fired the shots underneath the couch where he was sleeping, and Longmire's testimony.

¶ 66     We note that defendant's arguments fare no better under a prong-two analysis. Again, he submits that the gang references included comments by persons not subject to cross-examination and that the use of his post-arrest silence affected his substantial rights under prong two. However, the statements made in the videos by officers relating what Servin and Cardona said about gangs were not so egregious that the integrity of the trial was compromised, and even if Amaro mentioned defendant's post-arrest silence, the State did not comment on it (see, *e.g.*, *People v. Simmons*, 293 Ill. App. 3d 806, 812 (1998)). Thus, the integrity of the judicial process was not challenged.

¶ 67     In sum, any error concerning gang evidence is not, on its own, reversible in the plain-error or ineffective-assistance contexts.

¶ 68                               D. Proof of Gang Membership

¶ 69    Defendant, relying on *Murray*, 2019 IL 123289, ¶ 53, next argues that the State's evidence was insufficient to prove gang membership beyond a reasonable doubt because there was no evidence that the Spanish Gangster Disciples was a street gang engaged in a course or pattern of criminal activity. The State agrees, acknowledging that the conviction on count VII should be vacated because, where there was no evidence that the Spanish Gangster Disciples engaged in a course or pattern of criminal activity, it failed to establish a necessary element of the charge of unlawful possession of a firearm by a street gang member (see 720 ILCS 5/24-1.8(a)(1) (West 2016); 740 ILCS 147/10 (West 2016)).

¶ 70    However, the State urges that we invoke our authority under Illinois Supreme Court Rule 615(b)(3) (eff. Jan. 1, 1967) to instead enter a conviction of the lesser included offense of aggravated unlawful use of a weapon without a FOID card (720 ILCS 5/24-1.6(a)(2), (a)(3)(C) (West 2016)) and remand for resentencing on that charge, as was done by this court in *People v. Figueroa*, 2020 IL App (2d) 160650. The State notes that the evidence established the requirements of the lesser included charge—specifically, that defendant carried or possessed on his person upon a public street, alley, or land, within the city a firearm without having a valid FOID card. See 720 ILCS 5/24-1.6(a)(2), (a)(3)(C) (West 2016).

¶ 71    The parties are correct that the State presented no evidence that the Spanish Gangster Disciples constituted a street gang that engaged in a course or pattern of criminal activity. Further, there is no dispute that defendant did not possess a FOID card, and the evidence sufficiently established that defendant carried or possessed a weapon in public. However, we decline to enter judgment on the lesser included offense because, as discussed below, we are vacating all convictions based on cumulative error.

¶ 72                                                E. Cumulative Error

¶ 73    Defendant's final argument is that reversal is required due to the cumulative number of errors and the ineffective assistance he received at trial. The State responds that there was no error and, thus, no cumulative error. We agree with defendant.

¶ 74    Both the federal and Illinois constitutions protect a defendant's right to a fair, orderly, and impartial trial. See U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §§ 2, 8; *People v. Bull*, 185 Ill. 2d 179, 214 (1998). While a defendant is not entitled to a perfect trial, courts have recognized that individual trial errors that do not alone warrant reversal may cumulatively deprive a defendant of a fair trial. See *People v. Redmon*, 2022 IL App (3d) 190167, ¶ 34; *People v. Simmons*, 342 Ill. App. 3d 185, 191 (2003). "When such cumulative error occurs, due process and fundamental fairness require that the defendant's conviction be reversed and the case be remanded for a new trial, even when the defendant's guilt is overwhelming, to preserve the integrity of the judicial process." *Redmon*, 2022 IL App (3d) 190167, ¶ 34.

¶ 75    Here, we agree with defendant that the erroneous admission of both Longmire's interrogation videos and the gang evidence, while not individually reversible, particularly within the ineffective-assistance or plain-error contexts, cumulatively deprived him of a fair trial. While we will not reiterate all points from our preceding analyses, we note that Longmire's trial testimony was not so affirmatively damaging to the State's case that the State was justified in admitting his interrogation videos (notably, in their entirety) as an inconsistent statement, whether substantively or to impeach its own witness. In essence, by showing the jury the entire interrogation, the State was able to improperly bolster the consistent portions of Longmire's testimony, while publishing to the jury statements made by nontestifying witnesses and the opinions of the investigating detectives as to their theories of guilt.

¶ 76    In addition, Amaro never testified that the factors he considered when assessing defendant's alleged gang membership are of the type relied upon by experts in the field, nor did the State establish when or to whom Servin purportedly introduced defendant as "Shorty Folks" or why defendant was likely a member of the Spanish Gangster Disciples street gang, as opposed to one of the other "Folks nation" street gangs purportedly in the area. In addition, Amaro never testified that the Spanish Gangster Disciples was engaged in a pattern of criminal activity, and therefore the evidence failed to establish that it was a street gang, as statutorily defined. As the State now concedes, its failure to present sufficient evidence regarding gang membership requires us to reverse the conviction of possession of a weapon by a gang member, which was the *only* count for which gang membership was relevant. There was no evidence that the other charges were committed with a gang-related motive and, while the State contends that gang membership provided context to certain terminology, such as "Wolverine" or "Shorty," we disagree. Here, gang references were not necessary to explain that various persons had nicknames, and a context argument does not justify voluminous evidence that was clearly more prejudicial than probative. When we consider together the errors concerning Longmire's interrogation videos, the gang evidence introduced therein and through Amaro's testimony, and that, without the possession of a weapon by a gang member charge—the conviction on which we now reverse due to a failure of proof—*no* gang evidence would have been introduced on the most serious charges, we cannot conclude that defendant received a fair trial. In sum, under the facts of this case, we are convinced that due process and fundamental fairness require that defendant's convictions be reversed and the cause remanded for a new trial.

¶ 77    We note that, when a reviewing court remands for a new trial, it must consider whether a new trial would violate the double jeopardy clause. See *People v. McKown*, 236 Ill. 2d 278, 311 (2010).

> "If the evidence presented at the first trial, including the improperly admitted evidence, would have been sufficient for any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt, retrial is the proper remedy. [Citation.] If no rational trier of fact could so find, defendant may not be subjected to a second trial." *Id.*

Here, the evidence was sufficient to sustain defendant's convictions of attempted murder of a police officer, aggravated discharge of a firearm, and possession of a defaced firearm, such that there is no double-jeopardy implication to remanding those counts. However, "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials." *Burks v. United States*, 437 U.S. 1, 11 (1978). Because defendant was tried for unlawful possession of a firearm by a street gang member, but the State failed to satisfy its burden of proof, double jeopardy bars further prosecution on that charge and we reverse that conviction outright.

¶ 78                                    III. CONCLUSION

¶ 79    For the reasons stated, the judgment of the circuit court of Lake County is reversed and the cause is remanded.

¶ 80    Reversed and remanded.

2022 IL App (2d) 200195

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 16-CF-1655; the Hon. James K. Booras, Judge, presiding. |
| **Attorneys for Appellant:** | Steven Greenberg and Curt Lovelace, of Greenberg Trial Lawyers, and Andrew S. Gable, both of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Lynn M. Harrington, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |