**2024 IL 128805**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket No. 128805)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
OLVAN QUEZADA, Appellee.

*Opinion filed December 19, 2024.*

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Justices Neville, Overstreet, Rochford, and O'Brien concurred in the judgment and opinion.

Justice Holder White specially concurred, with opinion, joined by Chief Justice Theis.

## OPINION

¶ 1 Following a jury trial in the circuit court of Lake County, the defendant, Olvan Quezada, was convicted of attempted murder of a police officer (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016)), aggravated discharge of a firearm (*id.* § 24-1.2(a)(3)),

unlawful possession of a firearm by a street gang member (*id.* § 24-1.8(a)(1)), and possession of a defaced firearm (*id.* § 24-5(b)). On appeal, the appellate court reversed Quezada's conviction for unlawful possession of a firearm by a street gang member based on insufficient evidence and reversed his remaining convictions based on the cumulative effect of two unpreserved trial errors. 2022 IL App (2d) 200195. For the reasons that follow, we affirm that part of the appellate court's judgment that reversed Quezada's conviction for unlawful possession of a firearm by a street gang member and reverse that part of the appellate court's judgment that reversed Quezada's remaining convictions.

¶ 2                                      BACKGROUND

¶ 3        Quezada's convictions arose from events that took place on June 17, 2016. Police officers from the Waukegan Police Department responded to a report of a domestic disturbance at the Briarwood Apartments complex in Waukegan. After the dispute was resolved, one of the responding officers, Officer John Szostak, reported he heard gunshots. When additional officers responded to the apartment complex to investigate the gunshots, more shots were fired in the direction of the officers. Following an investigation, Quezada was arrested, and a gun was recovered under the cushion of a couch on which he had been sleeping. The following testimony was presented at trial.

¶ 4        Elise Salas testified she lived at the Briarwood Apartments complex with her fiancé, Jonathan Cardona, his sister and her children, and his mother. On June 17, 2016, Salas returned home from work to find Cardona, William Servin, Dominic Longmire, and Quezada in the apartment. Salas knew Servin and Longmire but had never met Quezada. Salas remembered she saw a gun at one point in the apartment that night but could not remember who had it. She did not know who brought the gun to the apartment or who removed it from the apartment. At some point, there was an argument between Cardona and his sister, and the police were called. Quezada left the apartment before the police arrived. The police spoke to Cardona and told him that either he or his sister needed to leave the apartment. Because his sister had her children at the apartment, Cardona left with Longmire and Servin.

¶ 5        Salas remained at the apartment and was with Cardona's mother when they heard a gunshot. They went outside to see what was happening and saw Cardona

and Servin running back to the apartment. The two men were arrested before they reached the apartment. As Salas watched the arrest, she heard a second round of gunshots.

¶ 6    Salas later went to the police station and identified Cardona, Servin, and Quezada from photo lineups. When shown a photograph depicting the gun found under the couch cushion on which Quezada had been sleeping, she testified that she was not 100% sure it was the same gun she saw in her apartment. In rebuttal, Salas acknowledged a written statement, in her handwriting, that indicated Quezada had a gun in his waistband while at her apartment. The statement also said that Quezada ran from the apartment when he heard the police being called. However, Salas testified she did not remember writing the statement.

¶ 7    Officer Szostak testified he went to the Briarwood Apartments complex in response to a domestic disturbance call. When he arrived at the apartment, he met with Cardona, Servin, and Longmire. After Cardona agreed to leave the apartment, Officer Szostak determined the issue was resolved, and no one was arrested. Cardona left the apartment with Servin and Longmire. Officer Szostak returned to his car to write his report about the incident. From his location in his car on the corner of Arthur Court and Caryn Lane, he heard two gunshots. He called dispatch to report the gunshots and then began to walk back down Arthur Court in the direction of where he thought the gunshots originated.

¶ 8    As he walked, Officer Szostak heard people laughing and running toward him. He recognized them as Cardona, Servin, and Longmire. Officer Szostak ordered the group to stop and get on the ground, but none of them complied. Cardona and Longmire ran between nearby cars while Servin started walking toward Officer Szostak. Officer Szostak ordered the men to come out, and Servin told them, "It's cool, it's the same officer." Cardona came out, but Longmire ran away. Officer Szostak ordered Cardona to approach him with his hands up. As Cardona complied, Officer Szostak heard and saw a copper-colored, spent shell casing fall from Cardona's T-shirt. Officer Jason Lau later joined Officer Szostak, and together the officers arrested Cardona and Servin and put them in police cars.

¶ 9    Officer Szostak left the area where the police cars were parked and went around the corner to see if the person who had been detained by other officers was Longmire. Officer Szostak then heard several gunshots and took cover. After the

shooting, Officer Szostak was called to Longmire's apartment, where he identified Longmire as the person who ran from him when he ordered the group of three men to stop. He placed Longmire under arrest and took him away from the apartment to await transport to the police station.

¶ 10 Officer Lau testified he went to Arthur Court in response to Officer Szostak's call for assistance. Officer Lau testified that he and the other officers who responded were in uniform and driving squad cars. As the officers stood around discussing the shell casing that had fallen from Cardona's shirt, Officer Lau heard four or five gunshots and felt projectiles going over the officers' heads. The situation was "pretty tense" and chaotic. He testified that, before the shots were fired, he heard someone shout something, although he could not hear what was said. Officer Lau thought the shots came from the west, in the direction of the pool, but he was not sure; because of the layout of the buildings and parking lot, the sound could have come from anywhere. Eventually, in response to information coming in on the police radio, Officer Lau and Detective Brian Maschek ran in pursuit of a suspect. They did not apprehend anyone, and Officer Lau then returned to his squad car and put Servin in Officer Angela Divirgilio's car for transport to the station.

¶ 11 Officer Divirgilio testified she originally responded to the domestic disturbance call but left the area after the situation was resolved. She returned when she received a call of shots fired. By the time she returned, Officers Szostak and Lau were in the process of handcuffing two individuals. Officer Maschek later arrived to collect evidence. As he and the other officers stood together, Officer Divirgilio heard someone yell something indistinct, and then shots were fired. She took cover and started scanning the area. From her position, she thought the shots came from the pool and basketball court area, northwest of where the officers were. The area was not well lit, but she saw a person running, wearing what may have been a white tank top. Officer Divirgilio could not identify the person and did not know if the person was ever apprehended. After the shooting, she took custody of the two individuals who had been placed under arrest and transported them to the Waukegan police station.

¶ 12 Officer Maschek testified that he was assigned as the shift evidence technician and was tasked with collecting evidence following the first shooting. After his arrival at the scene, he met with Officers Divirgilio and Lau and was shown the

- 4 -

evidence he was to collect. As the officers stood in a circle facing one another, with Officer Maschek facing west, he heard somebody yell, "F*** the police," which was followed by the sound of five gunshots. Officer Maschek heard what sounded like whistling in the air, which he thought was a projectile going over his head, and then heard a loud ding as if a bullet hit a steel pipe.

¶ 13　　　　Officer Maschek took cover behind a vehicle in the dimly lit parking lot and looked west to where he thought the shots originated. When the shooting stopped, Officer Maschek checked on his fellow officers and Servin and Cardona, then he radioed for additional assistance. After additional officers responded, Officer Maschek began processing the scene for evidence, collecting bullet casings, and taking photographs of cars that sustained damage in the shooting. From the impact of the bullets, Officer Maschek determined the direction of the bullets was toward the officers.

¶ 14　　　　After he processed the scene, Officer Maschek was directed to an apartment by Sergeant Brian Bradfield to process evidence. The apartment belonged to Tara and Dominic Longmire. In the apartment, Officer Maschek was directed to a couch, where he found a KelTech P11 9-millimeter handgun. He photographed the gun and took it into evidence. As he did so, he noticed the serial number was not clear. He also recovered two pairs of wet tennis shoes.

¶ 15　　　　Officer Christopher Llenza testified he responded to Officer Maschek's calls for assistance after the shooting. Upon arriving at the apartment complex, Officer Llenza went east of the complex to the corner of East Drive and Westwaukee Road, where Sergeant John Spiewak, Officer Fleming,[1] and Officer Szostak were taking cover. Officers Llenza and Spiewak then moved to a fence line on the corner of East Drive and George Street to watch for anyone running past from the direction where the initial calls of the shots came from. Officer Llenza heard a male voice talking to someone and then saw Quezada peek over the fence. Officer Spiewak shined his flashlight on Quezada and identified himself as a police officer. Quezada said "s***," dropped from the fence, and took off. The officers gave chase but were unable to catch him. The path of the chase went over wet, swampy ground, causing Officer Llenza's feet and the bottom of his pants to get wet. Officer Llenza later accompanied other officers to Longmire's apartment, where Officer Llenza saw

---

[1]Officer Fleming's first name does not appear in the record.

Quezada and identified him as the person from the chase. Officer Llenza noted that the bottoms of Quezada's jeans were wet and covered with grass.

¶ 16    Sergeant Bradfield testified he was working as the patrol sergeant on June 17, 2016, when he received the call that shots had been fired at police officers. When Sergeant Bradfield arrived, he joined Officer Szostak in the search for the shooter and evidence of the shooting. As the officers were collecting evidence, Sergeant Bradfield received a call from Sergeant Elias Agalianos, who was conducting interviews at the police station. Sergeant Agalianos informed him there were two people involved in the shooting who were not in custody and directed him to the Longmire apartment to search for the suspects.

¶ 17    Sergeant Bradfield, Officer Szostak, and other officers went to the apartment and found Longmire and Quezada. Officer Szostak identified Longmire as the person who ran from him. Sergeant Bradfield called Sergeant Spiewak to the apartment, and Sergeant Spiewak identified Quezada as the person who ran from him. Sergeant Bradfield then spoke to Tara Longmire and searched the couches in the living room, where he found a black handgun under the cushion of a couch with two cushions. Sergeant Bradfield directed Officer Maschek to retrieve the gun and place it into evidence.

¶ 18    Tara Longmire, Dominic Longmire's mother, testified she was studying when Longmire returned home with a young Hispanic man. Tara told them they could not stay and offered to drive the young man home. She went back to her room, leaving the two in the living room, and told them to let her know when they were ready to leave. When she left the living room, the young man was sitting on a loveseat with two cushions. Tara returned to her room and fell asleep. A short while later, she woke up to find police officers at her door asking if they could search her apartment. Tara consented to the search. After the search, the police showed her a gun recovered from her couch. Tara testified she did not own any guns and had never seen a gun in her house before.

¶ 19    Dominic Longmire testified he went to Cardona's apartment on June 17, 2016, to hang out. Cardona and Salas began arguing, and the police were called. While the police were talking to Cardona outside, Longmire felt it was time to leave, and he went home alone. Quezada had left before the police arrived. Longmire was about halfway home when he heard a gunshot. He called Salas, Cardona, and

Quezada to see if everyone was alright. None of the people he called answered their phones, so he started walking back to the apartment complex. When he got back, the police were arresting Cardona and Servin. Longmire then called Quezada and arranged to meet with him. Longmire was asked whether he was under the influence of any drugs or alcohol at the time, and he testified he could not remember.

¶ 20 After meeting up, Longmire and Quezada decided to walk to Longmire's apartment with the understanding that Longmire would take Quezada back to his home in Zion. Longmire testified he was walking behind Quezada when he saw Quezada point a gun in the air and shoot it. Longmire testified that, up to that point, he had not seen a handgun. After Quezada shot the gun, they ran to Longmire's apartment. Quezada brought the gun into the apartment. Longmire testified his plan was to take Quezada home but that he decided to make a root beer float first. Longmire and Quezada eventually fell asleep on the couches in Longmire's living room because it was late.

¶ 21 Longmire woke up when the police arrived at the apartment and arrested him. Longmire testified that he thought he was questioned by police for two to three days. When asked if he told the police that Quezada was known as "Hombre," Longmire denied knowing Quezada by that name and insisted he only knew him as "O" and "Skunk." Longmire testified he remembered circling Quezada's face in the police photo lineup, but he did not remember writing "Shot his pistol. I know him from mutual friends, D-L," because he was scared at the time of the identification. He further testified that, although he identified the gun in a picture and indicated "Hombre shot the gun," he also told the police he did not really get a good look at the gun.

¶ 22 On cross-examination, Longmire testified Quezada did not yell anything before firing the shot, which he aimed in the air above a building. From their location when Quezada fired the gun, Longmire could not see the police. After Quezada fired the gun, Longmire told him they had to leave the area because he did not want them hanging around in light of the police presence. Longmire intended to take Quezada home to Zion because he did not want him to get into trouble.

¶ 23 Longmire testified he told the detectives the truth during his interview. Longmire first told the police he was not with Quezada when the first shot was fired; he was with Cardona and Servin. However, Longmire testified that, when he

started to tell the truth, the detectives interrupted him and told him that was not the truth. At one point, a detective told Longmire that, if the detectives thought he was lying, they could have him charged with attempted murder and have his mother lose her house. The detectives also told Longmire they knew he was lying because his statements did not align with what other witnesses were telling the police. Longmire received a 20-minute break where the detectives gave him a cigarette and told him "We're going to let you think about this for a while. You have one more chance to tell us what we want to hear." When the detectives returned, Longmire began to tell them what they wanted to hear because they "basically threatened" him. This was when he began to write statements on the pictures the detectives presented, identifying Quezada as "Hombre" and that he shot the gun. Longmire denied telling the police that anyone shouted "F*** the police." Throughout cross-examination, defense counsel questioned Longmire about additional statements he made to the detectives and their conduct during the interrogation. During his testimony, Longmire acknowledged he had a recent felony conviction for robbery.

¶ 24    Sergeant Agalianos testified he and Detective George Valko interrogated Longmire about the shooting. The interrogation consisted of two interviews conducted in two rooms at the police station. Sergeant Agalianos explained that during the interview process, if there was a photographic lineup, they used independent police officers or detectives to show the interviewee the lineup. This procedure was designed to ensure independent identification where the detectives could not be accused of influencing an identification. Sergeant Agalianos testified this was the procedure used when Longmire was asked to view photo lineups during his interrogation.

¶ 25    Sergeant Agalianos identified a flash drive containing the video recordings of the Longmire interviews. The State then asked to admit the video recordings into evidence. The court stated the videos would be admitted, and defense counsel stated, "No objection, Judge." The State published the videos to the jury. In the videos, Longmire, who was not wearing a shirt, socks, or shoes, appeared draped in a blanket. Over the course of the interrogation, the detectives accused Longmire of lying and told him they would charge him with attempted murder unless he cooperated and was truthful. Sergeant Agalianos raised his voice at times as he spoke to Longmire. Eventually, Longmire told the police that Quezada fired the shots and that, before firing, Quezada declared he was going to shoot at the police.

¶ 26    After the jury watched the videos, Sergeant Agalianos continued his testimony. He explained that he was initially briefed about the case by other officers before he interviewed Cardona. A different detective interviewed Servin, and the two later conferred before Sergeant Agalianos called Sergeant Bradfield and directed him to Longmire's apartment to look for him. Sergeant Agalianos further advised Sergeant Bradfield to look for a "male Hispanic, approximately five-seven, five-eight with a blown out hairstyle," who had tattoos, wearing a black shirt and blue jeans. Longmire and Quezada were brought to the station shortly after.

¶ 27    Sergeant Agalianos explained his interview strategy over his 20-year career included evaluating the interviewee and determining whether he was truthful, cooperative, or withholding information. Depending on the situation, Sergeant Agalianos would sometimes raise his voice or yell to get the interviewee's attention. He compared this to catching a child, spouse, or friend in a lie and "call[ing] them out on it." Sergeant Agalianos explained that a parent may keep asking difficult questions of a child and explaining the consequences of being untruthful until the parent has the absolute truth.

¶ 28    On cross-examination, Sergeant Agalianos was asked if he raised his voice during the interview and whether he told Longmire "[i]f we think you're lying, I can have you charged with everything, including attempted murder." He acknowledged that he did and that he also told Longmire his mother could lose her house, explaining that he wanted Longmire to realize the seriousness of the situation and the potential consequences. Sergeant Agalianos agreed Longmire changed his story throughout the interview but attributed it to Longmire giving up more information through the interview process. He denied he suggested the phrase "I'm going to shoot the police" to Longmire, and he testified that the interviewing detectives "had to extract" the phrase from Longmire. Sergeant Agalianos further agreed that Detective Valko told Longmire, "If I were you, I would tell you whatever I want to hear to get out of that chair." However, Sergeant Agalianos added the statement could mean different things depending on how it was interpreted.

¶ 29    Detective Rigoberto Amaro testified he had been a detective with the Waukegan Police Department gang intelligence unit for approximately 11 years, where he conducted gang, narcotics, shooting, and violent crime investigations. He was

called to the police station to assist with the investigation into the shootings that took place on June 17, 2016. After being briefed by Sergeant Agalianos, Detective Amaro interviewed Servin. Later, when Quezada was brought to the station, Detective Amaro performed a gunshot residue test on Quezada's hands. Detective Amaro noticed that the lower parts of Quezada's pants were wet and that he had wet, muddy shoes. Quezada also had a tattoo on his arm, wore a blowout style haircut, and had a fresh cut on his right palm.

¶ 30　　　　Detective Amaro testified that he was proficient in understanding the gangs in and around Waukegan and that he had been qualified as an expert witness with regard to gangs a few times. As an expert, he had opined as to whether a person was in a specific gang and testified as to the nature of gangs and the differences between different gangs. The State asked the court to accept Detective Amaro as an expert in gangs. The court responded that defense counsel was "shrugging his shoulders," and the court therefore declared Detective Amaro an expert in the field of gangs.

¶ 31　　　　Detective Amaro opined that Quezada was affiliated with the Spanish Gangster Disciples street gang. He based his opinion on observations he made of Quezada, a conversation he had with Servin, and a review of reports in the case. On cross-examination, Detective Amaro explained that he formed his opinion without speaking to Quezada because Quezada did not wish to speak to him. Detective Amaro noticed a cover-up tattoo on Quezada's arm that covered a street gang tattoo. He asked Quezada if he was a member of the Serrano street gang, and Quezada did not answer.

¶ 32　　　　Detective Amaro further explained that, during the investigation, Servin introduced Quezada as "Shorty Folks" to other people, which was a term used to describe a young member or a person that is affiliated with the Folks Nation street gang. Defense counsel objected to this testimony because Detective Amaro had not provided a foundation for the conversation Servin had with other people. The court sustained the objection but also found defense counsel had opened the door to the testimony.

¶ 33　　　　On redirect examination, Detective Amaro testified street gang members do not introduce people as street gang members unless they were actually members of the gang. He explained that the Folks Nation consisted of multiple different gangs and

that the Spanish Gangster Disciples street gang was one of the gangs under the Folks Nation. It was not uncommon for members of the gangs to introduce themselves as "Folks" and make statements such as "That's my Folks right there." Members would also introduce each other as "Folks" to let someone know the introduced person was one of them. Detective Amaro testified that a "shorty" was a newer member of the gang who had not really been around that much.

¶ 34 Officer Michael Sliozis testified that he collected cell phones and a video recording from the apartment complex where the shooting occurred. The video recording was from cameras that faced the pool area and north from a maintenance shed at the apartment complex. A redacted version of the maintenance shed video was played before the jury, and Officer Sliozis testified the video depicted a man who raised and fired a gun.

¶ 35 Officer Sliozis also collected a pair of jeans and a pair of shoes from Quezada when Quezada was in custody. Officer Sliozis opined that, from the clothing Quezada was wearing, he was the person depicted in the maintenance shed video. However, on cross-examination, Officer Sliozis acknowledged that the clothes the person in the video was wearing were not particularly distinctive.

¶ 36 Scott Rochowicz testified that he worked for the Illinois State Police's microscopy and trace chemistry section, where he performed analyses for the identification of gunshot residue. Rochowicz tested Quezada's and Longmire's hands for gunshot residue and received negative results. Rochowicz explained that gunshot residue particles are easy to remove and can be removed by environmental factors such as rain and wind or by washing with soap and water.

¶ 37 Anthony Spadafora testified as an expert witness on firearms. He conducted a series of tests on the bullet casings and bullet fragments recovered from the scenes of the first and second shootings and concluded they were fired from the gun recovered in Longmire's apartment. No usable DNA or fingerprint evidence was recovered from the gun.

¶ 38 In closing argument, the State summarized the evidence it presented and contended it was overwhelming "even if you take Dominic Longmire out of here." Defense counsel, in his closing argument, asserted that the State's case was speculative and that the State's best witness, Longmire, could not be trusted.

Counsel noted that Longmire changed his statements to the police denying any involvement in identifying Quezada as the shooter because of the police threatening him. Counsel urged the jury to "[w]atch that video carefully because it's kind of horrifying to see what two experienced detectives who've been doing it 18 years, I want to say 20 years, they know how to manipulate a witness." Counsel further argued that the evidence that Quezada was in a gang was insufficient because there was no testimony that he was an active gang member and because the opinion linking him to a gang was based on a conversation with no specific details.

¶ 39    Following deliberations, the jury found Quezada guilty on all counts. The trial court sentenced Quezada to 27 years' imprisonment for attempted murder, 19 years' imprisonment for aggravated discharge of a firearm, 10 years' imprisonment for the unlawful possession of a firearm by a gang member, and 5 years' imprisonment for defacing a firearm, with the sentences to be served concurrently. Quezada filed a motion to reconsider his sentences, which was denied. He then appealed.

¶ 40    On appeal, Quezada argued, among other things, that the evidence was insufficient to prove that he was a member of a street gang, as required to sustain his conviction for unlawful possession of a firearm by a street gang member. 2022 IL App (2d) 200195, ¶ 69. Quezada further argued that the trial court committed plain error when it admitted the entirety of the videos of Longmire's police interview and when it admitted the gang evidence and that trial counsel was ineffective for not objecting to the admission of those two pieces of evidence. *Id.* ¶¶ 54, 63. Finally, Quezada argued that the cumulative effect of the alleged errors denied him a fair trial. ¶ 73.

¶ 41    The appellate court accepted the State's concession that the evidence was insufficient to convict Quezada of unlawful possession of a firearm by a street gang member and therefore reversed his conviction for that offense outright. *Id.* ¶ 77.[2] Regarding the admission of the entirety of the Longmire videos and the admission of the gang evidence, the appellate court found that the trial court had erred in admitting each. *Id.* ¶¶ 50-67. However, the appellate court then held that neither error, by itself, amounted to plain error, under either prong one or prong two of the plain error doctrine. For each error, the appellate court found that the evidence of

_____

[2]This ruling is not at issue in this court.

- 12 -

guilt was not closely balanced and that the integrity of the judicial process had not been compromised. *Id.*

¶ 42 The appellate court also rejected Quezada's contention that trial counsel was ineffective for not objecting to the admission of those two pieces of evidence. *Id.* ¶¶ 54, 63. With respect to the admission of the Longmire videos, the appellate court found that defense counsel's decision not to object was arguably a result of trial strategy to emphasize Longmire's inconsistencies and the police interrogation tactics. *Id.* ¶ 59. The appellate court also concluded that counsel "clearly sought to discredit Longmire's testimony" using the videos. *Id.*

¶ 43 After reaching the above conclusions, the appellate court ended its opinion with a section titled "Cumulative Error." See *id.* ¶ 72. In this section, the appellate court again stated that the trial court erred in admitting the Longmire videos and the gang evidence. *Id.* ¶ 73. Applying the cumulative error doctrine, the court then concluded "that the erroneous admission of both Longmire's interrogation videos and the gang evidence, while not individually reversible *** cumulatively deprived him of a fair trial." *Id.* ¶ 75. On this basis, the appellate court reversed Quezada's remaining convictions and remanded the cause for a new trial. *Id.* ¶ 76.

¶ 44 We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021).

¶ 45                                                  ANALYSIS

¶ 46 Before this court, the State contends the appellate court erred in its application of the cumulative error doctrine. That doctrine states, in general, that individual trial errors that do not entitle a defendant to appellate relief may do so if the errors, when considered in the aggregate, "have the cumulative effect of denying [the] defendant a fair trial." *People v. Speight*, 153 Ill. 2d 365, 376 (1992); see *People v. Albanese*, 102 Ill. 2d 54, 83 (1984) ("it is true that trial errors may have a cumulative effect when considered together"); *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993) ("a column of errors may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts"). Cumulative error can arise only from actual trial errors. *People v. Franklin*, 135 Ill. 2d 78, 105 (1990) (where none of the points relied upon by a defendant constitute

error, "logic dictates that there cannot be cumulative error"). Further, as its name suggests, cumulative error can occur only when there is more than one error. *United States v. Moore*, 641 F.3d 812, 830 (7th Cir. 2011).

¶ 47 The State does not dispute that the cumulative error doctrine applies to trial errors that have been properly preserved. In this case, however, the two trial errors considered by the appellate court in its cumulative error analysis were both forfeited. Thus, the question this court must address is how the cumulative error doctrine applies to trial errors that have *not* been properly preserved.

¶ 48 One possible answer to this question would be to say that the cumulative error doctrine does not apply to forfeited errors at all—that only preserved errors may be component parts of a cumulative error claim and analysis, and that unpreserved errors may only be reviewed for plain error on an individual basis. The difficulty with that approach, however, is that it is at odds with the fundamental principle that forfeiture is "an admonition to the parties, not a limitation upon the jurisdiction of the reviewing court" (*Hux v. Raben*, 38 Ill. 2d 223, 224 (1967)), and reviewing courts are not absolutely barred from reviewing procedurally defaulted claims (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)). A reviewing court always has the power to grant relief—regardless of a defendant's forfeiture—in instances where clear or obvious trial error has rendered a trial fundamentally unfair and undermined the integrity of the judicial process or where the reviewing court concludes that trial error has resulted in the conviction of an innocent person. *People v. Sebby*, 2017 IL 119445, ¶ 48 (discussing the plain error rule); *People v. Herron*, 215 Ill. 2d 167, 186 (2005).

¶ 49 To hold that the cumulative error doctrine does not apply at all to forfeited errors would turn this understanding of forfeiture on its head. Adopting such a rule would mean that, even in those cases where a reviewing court is firmly convinced that the cumulative effect of multiple, unpreserved trial errors has resulted in a fundamentally unfair trial and that the judgment must be reversed to protect the integrity of the judicial process, or that the errors have resulted in the conviction of an innocent person, the court would nevertheless be powerless to act. In other words, adopting such a rule would turn forfeiture from a limitation on the defendant into an absolute bar on the reviewing court's ability to grant relief, regardless of the cumulative effect of the trial errors or the potential injustice done. Since such a

result is plainly contrary to long-settled principles concerning forfeiture, we must reject the proposition that the cumulative error doctrine may not be applied to forfeited errors under any circumstances.

¶ 50 At the opposite extreme, a second possible answer to the question of how to apply the cumulative error doctrine to unpreserved trial errors would be to find that forfeiture concerns should simply be disregarded whenever a defendant raises a claim of cumulative error. The State contends this is the approach adopted by the appellate court in this case. The State notes that neither of the errors addressed by the appellate court in its cumulative error analysis had been properly preserved. The State further notes that, despite this fact, the appellate court made no reference to plain error in its cumulative error analysis and did not acknowledge that the errors at issue had been forfeited. Instead, the court simply addressed the two errors as if they had been properly preserved. The State contends this was error and that the appellate court could not do "what it did here, which is review these two forfeited claims of error *de novo* simply because they've been packaged together and presented under the umbrella of a due process claim of cumulative error." We agree.

¶ 51 To overcome forfeiture on appeal, a defendant has the burden of establishing plain error, under either the closely balanced evidence prong or the substantial rights prong of the plain error test. *Sebby*, 2017 IL 119445, ¶ 48. To hold that forfeiture concerns may be completely set aside in a cumulative error claim would effectively negate this plain error framework and would improperly relieve the defendant of his burden of persuasion to show that reversal is required. Accordingly, we reject the notion, advanced by the appellate court in this case, that forfeiture concerns play no role in a cumulative error claim and analysis of unpreserved trial errors.

¶ 52 The State offers a third approach to addressing cumulative error and forfeiture. The State contends that the appropriate way to address a cumulative error claim involving unpreserved errors is simply to place the cumulative errors within the plain error framework. According to the State, "only when a cumulative-error claim based on unpreserved components is *itself* reviewable as plain error" can the reviewing court consider "unpreserved components that were not individually reviewable as plain error." In other words, according to the State, to overcome the

forfeiture, the defendant must establish that the cumulative effect of the unpreserved errors rises to the level of plain error.[3]

¶ 53    In support of this contention, the State cites *People v. Blue*, 189 Ill. 2d 99 (2000), a decision in which this court reversed the defendant's murder conviction, despite overwhelming evidence of guilt, based on the cumulative effect of multiple trial errors, not all of which had been properly preserved. The State explains:

> "*Blue* reviewed the defendant's cumulative-error claim under 'the same test that this [C]ourt uses whenever it applies the second prong of the plain error test,' *id.* at 138 (citing Ill. S. Ct. R. 615(a)), and granted relief because the cumulative effect of the component errors so undermined the integrity of the judicial process that 'a new trial [wa]s necessary in order to preserve the trustworthiness and reputation of the judicial process,' *id.* at 139. See *Herron*, 215 Ill. 2d at 187 (citing *Blue* as second-prong plain-error case). In other words, because the defendant's cumulative-error claim relied on unpreserved components not reviewable as plain error, *Blue* did not review the cumulative-error claim *de novo*, like the appellate court here did, but for plain error."

During oral argument before this court, the State further explained the reasoning of *Blue*:

> "*Blue* is indeed a case about a due process claim of cumulative error but more specifically it's a case about reviewing a due process claim of cumulative error that is based on unpreserved components, and what *Blue* did was review that claim expressly under second prong plain error, looking to see whether those

---

[3]The State also at times asserts in its briefs that "an unpreserved error cannot be considered as a component of a due process claim of cumulative error unless it rises to the level of plain error." This contention is inherently contradictory. If an individual trial error is, by itself, plain error, that error would require reversal. See *People v. Keene*, 169 Ill. 2d 1, 17 (1995) (all plain errors are reversible errors). An individual plain error could therefore never be a "component of a due process claim of cumulative error" because the cumulative error claim would never be reached. See *Willingham v. Mullin*, 296 F.3d 917, 935 (10th Cir. 2002) ("This rationale, taken on its face, would render the cumulative error inquiry meaningless, since it indicates that cumulative error may be predicated only upon individual error already requiring reversal."). Notably, although mentioned in its briefs, the State did not pursue this line of reasoning at oral argument before this court, abandoning it in favor of the argument discussed above.

component errors, when viewed cumulatively, rose to the level of second prong plain error."

We agree with the State's analysis of *Blue*. See *People v. Smith*, 2017 IL App (1st) 143728, ¶¶ 45, 77-79 (describing *Blue* in similar terms).

¶ 54    We also find instructive our appellate court's decision in *People v. Darr*, 2018 IL App (3d) 150562. In *Darr*, the defendant identified eight alleged trial errors that he maintained required reversal of his convictions under the cumulative error doctrine. *Id.* ¶ 45. Although the errors had not been preserved, the defendant asserted that this fact was " 'irrelevant to a cumulative-error claim.' " *Id.* ¶ 46. The appellate court rejected this argument, stating there was no authority "to support the contention that, by combining multiple unpreserved, forfeited errors, a defendant may transform his claim into one that is preserved or not forfeited." *Id.*

¶ 55    The appellate court then analyzed the defendant's cumulative error argument within a plain error framework. *Id.* ¶¶ 47-51. The court emphasized that, because the defendant was raising a plain error argument, the burden rested with him to show that reversal was required. *Id.* ¶ 48. The court further noted that the defendant was invoking the second prong of the plain error doctrine and contending that the accumulation of errors resulted in a fundamentally unfair trial, warranting reversal. *Id.* ¶ 51. The appellate court then stated:

"Thus, our analysis must proceed as follows. First, we must determine which of the eight alleged errors actually constitute 'clear or obvious' errors. *Piatkowski*, 225 Ill. 2d at 565. Then, we must determine whether the cumulative impact of those errors 'affected the fairness of the trial and challenged the integrity of the judicial process.' *Sebby*, 2017 IL 119445, ¶ 50." *Id.*

Applying this analysis, the appellate court reviewed the defendant's alleged errors and rejected his "cumulative plain error argument." *Id.* ¶ 85.

¶ 56    The cumulative plain error analysis set forth in *Darr* is persuasive and consistent with *Blue*. That approach ensures that the forfeited errors are not an absolute bar to the reviewing court's ability to grant relief while, at the same time, appropriately placing the burden on the defendant to establish plain error. We adopt that approach in our analysis here.

¶ 57 In so doing, we note that Illinois courts are not alone in recognizing that the appropriate way to address unpreserved errors in a cumulative error claim is to determine whether the aggregate effect of those errors rises to the level of plain error. As the State points out, numerous federal courts have reached the same conclusion. See, *e.g.*, *Hagans v. United States*, 96 A.3d 1, 44 (D.C. 2014) ("if the errors all were unpreserved, their aggregate impact would have to amount to plain error before the court might exercise its discretion to grant relief"); *United States v. Caraway*, 534 F.3d 1290, 1302 (10th Cir. 2008) ("the court should consider whether *** preserved errors, when considered in conjunction with the unpreserved errors, are sufficient to overcome the hurdles necessary to establish plain error"); *United States v. Reyes-Garcia*, 798 F. App'x 346, 360 (11th Cir. 2019) ("We consider all errors preserved for appeal and all plain errors in the context of the trial 'as a whole to determine whether the appellant was afforded a fundamentally fair trial.' "); *United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002) ("Under the 'cumulative error doctrine,' [the defendant] can satisfy the requirements of the [federal plain error doctrine] if the combined effect of the two Rule 11 errors affected his substantial rights, even if individually neither error is sufficiently prejudicial."); *United States v. Necoechea*, 986 F.2d 1273, 1283 (9th Cir. 1993) ("we review the cumulative impact of the possible plain errors for plain error"); Rachel A. Van Cleave, *When Is an Error Not an "Error"? Habeas Corpus and Cumulative Error Analysis*, 46 Baylor L. Rev. 59, 87 (1994) ("In federal cases on direct review, when an individual alleges cumulative error but has failed to preserve a claim by objecting at trial, courts apply the 'plain error' rule. A different standard is not used simply because the appellant argues cumulative error.").

¶ 58 Applying the appropriate plain error principles to this case, the State argues that, because the two errors alleged by Quezada "do not cumulatively constitute plain error, defendant's cumulative-error claim does not entitle him to relief on plain-error review." We agree.

¶ 59 As the State points out, Quezada's trial counsel affirmatively acquiesced to the admission of the entirety of Longmire's video-recorded statements. In response to the prosecution's offer putting the statements into evidence, defense counsel stated, "No objection, Judge." See *People v. Caffey*, 205 Ill. 2d 52, 113-14 (2001) (when the defendant was asked whether he objected to the introduction of a 911 recording and replied, " 'No objection, Judge,' " defendant "acquiesced in the admission of

this evidence"). When a defendant actively invites or acquiesces to the admission of a piece of evidence at trial, he cannot challenge the admission of that evidence as plain error on appeal. This is so because invited error or acquiescence "does not raise a mere forfeiture to which the plain-error exception might apply; it creates an estoppel that precludes plain-error analysis." *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 44 (citing *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17); see *McDonald v. Federal Laboratories, Inc.*, 724 F.2d 243, 248 (1st Cir. 1984) ("the 'plain error' doctrine has no application where the party claiming error invited or elicited the alleged error"). That is precisely what occurred in this case. Accordingly, Quezada is estopped from challenging the admission of the Longmire interrogation videos as part of an individual or cumulative plain error claim.

¶ 60    Quezada briefly argues that his attorney's decision not to object to the admission of the videos was "an error, not a strategic decision." We disagree. Courts must indulge a strong presumption that counsel's conduct is sound trial strategy. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Here, Quezada cannot overcome this presumption. As the appellate court noted, Quezada's trial counsel "clearly sought to discredit Longmire's testimony, and his decision not to object to the State's introduction of the videos could arguably have been strategy to emphasize Longmire's inconsistencies and the police interrogation tactics." 2022 IL App (2d) 200195, ¶ 59.

¶ 61    Having excluded the admission of the videos from consideration, the only remaining alleged error is the admission of the gang evidence. However, even if the admission of that evidence was error, that fact, standing alone, cannot justify reversal. As the appellate court correctly concluded, when considered by itself, the admission of the gang evidence did not amount to plain error or ineffective assistance of counsel. *Id.* ¶¶ 65-67. Accordingly, that part of the appellate court's judgment that reversed Quezada's convictions must be reversed.

¶ 62                                    CONCLUSION

¶ 63    For the foregoing reasons, we affirm that part of the appellate court's judgment that reversed Quezada's conviction for unlawful possession of a firearm by a street gang member. We reverse that part of the appellate court's judgment that reversed Quezada's remaining convictions for attempted murder of a police officer,

aggravated discharge of a firearm, and possession of a defaced firearm and, on that basis, granted him a new trial.

¶ 64       Appellate court judgment affirmed in part and reversed in part.

¶ 65       Circuit court judgment affirmed in part and reversed in part.

¶ 66       JUSTICE HOLDER WHITE, specially concurring:

¶ 67       I agree with the majority that the judgment of the appellate court should be reversed. I disagree, however, with the majority's reasoning as to the review, under a cumulative error analysis, of unpreserved errors that are not plain errors. The majority's holding creates a new avenue to excuse a defendant's forfeiture of trial errors and, in doing so, ignores the fundamental basis for the plain error rule and weakens the finality the rule guarantees. I therefore specially concur.

¶ 68       In this appeal, the State asked us to determine whether a defendant can show cumulative error rendered his trial unfair where the constituent errors are not preserved and do not individually satisfy Illinois's plain error test as set forth in Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967). The State argued that only preserved and plain errors may be considered as components of a due process claim of cumulative error. The State added that, under settled forfeiture principles, an unpreserved claim of error may be reviewed only if it rises to the level of plain error. Thus, when a defendant fails to show unpreserved errors rise to the level of plain error, the errors cannot be subject to appellate review under a due process claim of cumulative error. These arguments were consistent with the argument the State set forth in its petition for leave to appeal to this court, where the State argued that the appellate court's decision in this case conflicted with

> "this Court's decisions in *People v. Hall*, 194 Ill. 2d 305 (2000), and *People v. Caffey*, 205 Ill. 2d 52 (2001), which explained that where claims of error are not individually reversible as plain error or ineffective assistance of counsel, they may not be combined to reverse a conviction under a cumulative error analysis."

¶ 69 The majority agrees with a different argument by the State, which the majority adopts as the rule in this case. The majority adopts the argument the State raised in its reply brief, that "only when a cumulative error claim based on unpreserved components is *itself* reviewable as plain error has the Court considered unpreserved components that were not individually reviewable as plain error. See *People v. Blue*, 189 Ill. 2d 99, 138-39 (2000)." (Emphasis in original). The State made this argument in asserting that the appellate court erred in reviewing defendant's claim of cumulative error *de novo* when the underlying claims of error were not plain errors. However, the State's argument in reply is inconsistent with the arguments the State made in its opening brief and petition for leave to appeal to this court. The inconsistency appears to arise from the State's description of plain error as a standard of review akin to *de novo* review. The State's reference to the plain error test as a standard of review is "at best imprecise." *People v. Herron*, 215 Ill. 2d 167, 180 n.1 (2005). As we explained in *Herron*, the plain error test is not a standard of review. "It refers to the stance that a reviewing court takes with respect to a trial court error, and is thus the wrong label in the context of plain error, where there is no trial court order to review." *Id.* The plain error test is more aptly described as a standard to help a reviewing court determine when to excuse forfeiture. *Id.* Because I find the State's earlier arguments more persuasive and in line with our plain error doctrine, I agree with the arguments the State made in its opening brief and its petition for leave to appeal.

¶ 70 This court has recognized that, while individual trial errors may not require reversal, those same errors considered together may have the cumulative effect of denying defendant a fair trial. *People v. Speight*, 153 Ill. 2d 365, 376 (1992). However, even though trial errors may have a cumulative effect when considered together, the "whole can be no greater than the sum of its parts." See *People v. Albanese*, 102 Ill. 2d 54, 82-83 (1984) (rejecting defendant's cumulative error argument where the underlying errors were not reversible), *abrogated by People v. Gacho*, 122 Ill. 2d 221 (1988). Where a defendant cannot establish the component errors are errors, the defendant's cumulative error claim cannot be meritorious. So too should it be when a defendant cannot establish his unpreserved errors are plain errors, as cumulative error analysis is not a means of excusing a defendant's forfeiture of errors. For that, Illinois courts look to the plain error doctrine. See *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 71 It is well settled in Illinois that, to preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion. *Id.* Failure to take either step results in forfeiture of the claim of error. *Id.* Rule 615(a) provides a well-established exception to the forfeiture principle, allowing substantial or plain errors to be noticed although they were not brought to the attention of the trial court. *Id.* The plain error rule gives reviewing courts discretion to review forfeited errors under two alternative prongs: (1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Id.* If a defendant cannot show clear error that satisfies either prong of the plain error test, the reviewing court must honor defendant's forfeiture of the issue. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 72 The plain error doctrine is not "a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court." *People v. Precup*, 73 Ill. 2d 7, 16 (1978). Rather, it is a narrow and limited exception to the general forfeiture rule whose purpose is to protect the rights of the defendant and the integrity and reputation of the judicial process. *Herron*, 215 Ill. 2d at 177.

¶ 73 Our rules on forfeiture encourage the defendant to raise issues before the trial court, which allows the court to correct its own errors and consequently disallows reversal on appeal based on defendant's inaction. *Id.* at 175. An accused may not sit idly by and allow irregular proceedings to occur without objection and afterwards seek to reverse his conviction by reason of those same irregularities. *Id.* (citing *Bruen v. People*, 206 Ill. 417 (1903)). Other than the plain error doctrine, Illinois courts also have discretion to consider constitutional issues that have properly been raised at trial but are forfeited because they were not included in a posttrial motion, as long as they can be raised later in a postconviction hearing petition. *People v. Enoch*, 122 Ill. 2d 176, 190 (1988). By limiting review of forfeited issues to those that fall under these exceptions, this court promotes judicial economy and finality of judgments and protects the integrity of the judicial system and the rights of criminal defendants. *Id.*

¶ 74    Despite our plain error doctrine, our precedent has allowed courts to review unpreserved errors without applying the plain error doctrine when the court believes fundamental fairness so requires. This later approach stems from our decision in *Hux v. Raben*, 38 Ill. 2d 223, 224 (1967), a civil case in which the plaintiffs argued the appellate court was without jurisdiction to decide the case on grounds that had not been raised by the parties. The plaintiffs' argument was that " '[a] court of appeal lacks power and jurisdiction to raise defenses of its own motion and to decide them of its own motion.' " *Id.* This court rejected this argument, noting that the

> "last sentence of Rule 341(e)(7)[4] of the rules of this court [citation], 'Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing', states an admonition to the parties, not a limitation upon the jurisdiction of the reviewing court." *Id.*

The court held that the distinction was clear when the rule was read in conjunction with Rule 366 (Ill. S. Ct. R. 366 (eff. Jan. 1, 1967)), dealing with the powers of a reviewing court and the scope of review in civil cases. *Hux*, 38 Ill. 2d at 224. In criminal cases, a similar thought was expressed through Rule 615, which indicates plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. *Id.* The court held that Rules 366 and 615 recognize that the responsibility of a reviewing court for a just result and for the maintenance of a sound and uniform body of precedent may sometimes override the considerations of forfeiture that stem from the adversary character of our system. *Id.* at 225. The *Hux* court therefore recognized that forfeited errors can be considered, in the criminal context, under Rule 615(a). In other words, a reviewing court can address a defendant's forfeited errors if he can show they are plain errors. *Hux* did not excuse a defendant from making that showing and tied the court's ability to review those forfeited errors to the defendant's ability to satisfy Rule 615(a).

¶ 75    Since *Hux*, the rule has taken on a life of its own, separate from the logical underpinnings expressed in *Hux*. See *People v. Heider*, 231 Ill. 2d 1, 27 (2008) (Thomas, C.J., dissenting, joined by Garman and Karmeier, JJ.) (describing the rule from *Hux* as "oft-misused and misunderstood" and noting that "[w]hen a court uses

---

[4]This provision is now found in Rule 341(h)(7). See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

the phrase 'forfeiture is a limitation on the parties and not on the court' as an independent basis for excusing a defendant's forfeiture, it improperly relieves the defendant of his burden of establishing plain error"). This allows courts of appeal to review forfeited claims of error even when a litigant fails to satisfy either prong of the plain error test. Also, the application of this abridged statement from *Hux* has been inconsistent. See, *e.g.*, *People v. Sophanavong*, 2020 IL 124337, ¶ 88 (Neville, J., dissenting) (where the court relied on the rule to excuse the State's forfeiture but did not do so to excuse the defendant's forfeiture), *overruled on other grounds by People v. Ratliff*, 2024 IL 129356.

¶ 76    Based on our plain error doctrine and the logical underpinnings on which it rests, I would find that a cumulative error analysis can only be applied to preserved errors and plain errors. The majority rejects this approach, claiming that under *Hux*

> "[t]he difficulty with that approach, however, is that it is at odds with the fundamental principle that forfeiture is 'an admonition to the parties, not a limitation upon the jurisdiction of the reviewing court' (*Hux v. Raben*, 38 Ill. 2d 223, 224 (1967)), and reviewing courts are not absolutely barred from reviewing procedurally defaulted claims (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967))." *Supra* ¶ 48.

The majority expresses concern that honoring a defendant's forfeiture where he does not show plain error, instead of considering his forfeited errors under cumulative error,

> "would mean that, even in those cases where a reviewing court is firmly convinced that the cumulative effect of multiple, unpreserved trial errors has resulted in a fundamentally unfair trial and that the judgment must be reversed to protect the integrity of the judicial process, or that the errors have resulted in the conviction of an innocent person, the court would nevertheless be powerless to act." *Supra* ¶ 49.

I disagree with this statement for the reasons stated above but also because this court has recognized that plain error, while a nonconstitutional doctrine, has roots in the same soil as due process. *Herron*, 215 Ill. 2d at 177. Therefore, the two prongs of the plain error test are " 'two different ways to ensure the same thing—namely, a fair trial.' " *People v. Moon*, 2022 IL 125959, ¶ 20 (quoting *Herron*, 215 Ill. 2d

at 179). We have therefore always considered the fundamental fairness to a defendant when considering his forfeiture of trial errors in the context of the plain error doctrine. See *Herron*, 215 Ill. 2d at 177. We should continue to do so. When a defendant fails to preserve his claims of error and the errors are not plain errors, the court should not excuse the defendant's forfeiture in the name of fundamental fairness by combining his multiple forfeited errors to review them under a cumulative error analysis. To do so goes against the plain error doctrine and the principles on which it is based.

¶ 77 The majority relies on *People v. Blue*, 189 Ill. 2d 99 (2000), in support of its position. However, the majority misunderstands *Blue* and misapplies its holding. In *Blue*, the defendant was convicted of the first degree murder of a police officer and sentenced to death. *Id.* at 103. On direct appeal to this court, the defendant argued that he was denied a fair trial as a result of prosecutorial misconduct throughout the trial. *Id.* at 119. The defendant also argued that the trial court erred by (1) refusing to ask potential jurors if they would automatically sentence the defendant to death for killing a police officer, (2) permitting the State to display a life-size mannequin clothed with the deceased officer's uniform and allowing the exhibit to go to the jury room during the jury's deliberations, (3) allowing the State to argue that the officer's family and the police "needed to hear" from the jury, and (4) sustaining hearsay objections by the State during defense counsel's examination of a witness, where the State had elicited hearsay from the same witness on direct examination. *Id.* The defendant did not argue that all the errors he identified cumulatively denied him a fair trial. See *id.* at 119-20.

¶ 78 This court first reviewed the court's admission of the uniform and concluded that, although the uniform was at least nominally probative of a material fact, "[t]he nature and presentation of the uniform rendered the exhibit so disturbing that its prejudicial impact outweighed its probative value" and its admission into evidence was error. *Id.* at 126. There was no indication that this issue was forfeited, and the court did not engage in a plain error analysis.

¶ 79 The court then addressed the defendant's argument that he was deprived of due process when the trial court allowed the State, in rebuttal closing argument, to make inappropriate references to police and to the victim's family. *Id.* at 126-27. The court noted that the State had argued this error was forfeited by the defendant's

failure to both object at trial and include the issue in a posttrial motion. *Id.* at 127. However, the court excused the forfeiture "[u]nder the unique circumstances of th[e] case" so it could address the merits of the defendant's arguments and protect his interest in receiving a fair trial. *Id.* (citing *People v. Kliner*, 185 Ill. 2d 81, 127 (1998) (waiver doctrine is a limitation on the parties, not the court)). Addressing the claim of error, the court concluded that the State's statements in the rebuttal closing argument regarding the victim's family and the police officers needing to hear from the jury were an unequivocal and erroneous appeal to the jury's emotions. *Id.* at 130. The court described the State's arguments as "nakedly prejudicial." *Id.* at 134. The court thus concluded the trial court abused its discretion in permitting the State to make this argument. *Id.* at 132-33.

¶ 80    Though the court did not spell it out, the court's finding of error in the State's arguments and its finding that the arguments were "nakedly prejudicial" were a finding of second prong plain error that would have excused the defendant's forfeiture of the issue. This is the definition of second prong plain error, and it would have resulted in the defendant in *Blue* receiving a new trial on this error alone. See *People v. Wheeler*, 226 Ill. 2d 92, 131 (2007) (finding a new trial was warranted because of the prosecutor's utilization of closing arguments to inflame the passions and prejudices of the jury, which constituted a material factor in the defendant's conviction).

¶ 81    The court then considered one more claim from the defendant, that he was deprived of a fair trial due to the State's improper examination and treatment of certain witnesses, use of "testifying objections," and abusive conduct toward defense counsel. *Blue*, 189 Ill. 2d at 134-35. The court provided examples of the prosecutors' statements that it found egregious and concluded that the trial court erred in overruling objections to the statements. *Id.* at 135-36. The court also found that the prosecutor's statements gave the State an unfair advantage before the jury. *Id.* at 137. There was no indication that this issue was forfeited, and the court did not engage in a plain error analysis.

¶ 82    Finally, the court arrived at the part of its analysis it titled "Cumulative Error." *Id.* The court began its discussion here by noting,

> "In response to each assertion of error by defendant, the State urges that, regardless of whether error occurred, the evidence against defendant at the guilt

and sentencing phases was so overwhelming that the absence of these errors would have made no difference in the outcome of the trial. This court may invoke the harmless error doctrine to dispose of claims of error that have a *de minimis* impact on the outcome of the case." *Id.* at 137-38.

The court went on to discuss the prejudice to the defendant, listed the prejudicial errors, and concluded that "the trial court allowed the guilty verdict to rest on considerations other than the evidence alone." *Id.* at 140. The court was not cumulating nonprejudicial errors in the case to determine whether they were jointly prejudicial, as the court had already concluded the errors were prejudicial individually. See *id.* at 139. ("Each of the errors detailed above, in and of itself, casts doubt upon the reliability of the judicial process."). The court aggregated the errors—preserved and plain—to respond to the State's harmless error argument.[5] *Id.* at 137-39; see *id.* at 139 ("Cumulatively, we find that the errors created a pervasive pattern of unfair prejudice to defendant's case.").

¶ 83 The court also looked at the cumulative impact of the prosecutors' statements to address a more serious problem. In *People v. Johnson*, 208 Ill. 2d 53, 65 (2003), a consolidated appeal from the trials of Blue's codefendants, this court clarified that "*Blue* represents an important step this court has taken to stem prosecutorial misconduct, a problem that courts across the country have, for the most part, been unable or unwilling to control." It was the widespread problem of prosecutorial misconduct at the time *Blue* was decided that drove this court's analysis, and its cumulative error analysis must be considered in this light. See *id.* at 75 ("Indeed, the predominant feature of this court's cumulative error analysis in *Blue* concerned the prosecutors' relentless appeal to the jurors' passions and emotions, culminating in a 'nakedly prejudicial' closing argument.").

¶ 84 The unique circumstances in *Blue* and this court's analysis in the case do not logically lead to the majority's conclusion that unpreserved and unprejudicial errors can be aggregated to find cumulative error in all cases. See *id.* at 117 (noting "*Blue* does not furnish a license to courts of review to adopt a cursory or skeletal analysis of the facts and issues before them. It *does* signal our intolerance of pervasive

---

[5]I do not suggest that plain errors are subject to a harmless error analysis. This court has been clear that the two analyses are different. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003) (discussing the difference between plain error and harmless error).

prosecutorial misconduct that deliberately undermines the process by which we determine a defendant's guilt or innocence."). This can be seen in two cases this court decided after *Blue*, where this court declined to consider a defendant's cumulative error claim where the alleged underlying errors were either not errors or were not plain errors. In *People v. Hall*, 194 Ill. 2d 305, 350 (2000), in response to the defendant's claim of cumulative error, the court first recognized that "[i]ndividual trial errors may have the cumulative effect of denying a defendant a fair trial" (citing *Speight*, 153 Ill. 2d at 376). The court then distinguished *Blue*, finding "the extreme circumstances present in *Blue*, which compelled this court to reverse the defendant's conviction and to order a new trial, are not present here." *Id.* The court reasoned that, because it had rejected the defendant's claims of error, found one to be harmless, and found that the balance of the errors claimed by the defendant were not plain error, the defendant was not entitled to a new trial based on cumulative error. *Id.* at 350-51. Notably, the court did not aggregate the claimed errors that were not plain error and address the defendant's claim of cumulative error.

¶ 85        Similarly, in *People v. Caffey*, 205 Ill. 2d 52, 117-18 (2001), this court rejected the defendant's claim of cumulative error because it had rejected all but one of the defendant's claims of error at the guilt phase of his trial. The court stated "[w]e have concluded either that no error occurred at all, or any error that may have occurred did not rise to the level of plain error. Accordingly, defendant is not entitled to a new trial on the basis of cumulative error." *Id.* at 118 (citing *Hall*, 194 Ill. 2d at 350-51). As in *Hall*, the *Caffey* court did not aggregate the defendant's forfeited errors to determine whether cumulative error occurred.

¶ 86        Other courts have taken the approach we took in *Hall* and *Caffey*. See *State v. McAlpin*, 169 Ohio St. 3d 279, 2022-Ohio-1567, 204 N.E.3d 459, ¶ 259 ("Unlike preserved errors that might be harmless alone but prejudicial in the aggregate, unobjected-to errors that do not meet the plain-error standard 'cannot become prejudicial by sheer weight of numbers.' " (quoting *State v. Hill*, 661 N.E.2d 1068, 1084 (Ohio 1996))); see also *United States v. Christian*, 673 F.3d 702, 708 (7th Cir. 2012) ("When an appellant alleges cumulative error, we will only consider plain errors and errors that were preserved for appellate review."); *United States v. Cristerna-Gonzalez*, 962 F.3d 1253, 1268 (10th Cir. 2020) (declining to consider, under cumulative error review, a defendant's claim of unpreserved error that did

not satisfy the federal plain error test); *Clark v. Chappell*, 936 F.3d 944, 993 (9th Cir. 2019) (noting that in reviewing for cumulative error, the court must review all errors preserved for appeal and all plain errors).

¶ 87 Nevertheless, I agree with the majority that defendant's first claim of error, the admission of the Longmire videos, was invited error. As the appellate court found, defendant's remaining claim of error was not plain error. Therefore, I concur in the majority's decision to reverse the appellate court's order reversing defendant's convictions due to cumulative error and upholding the part of the appellate court's order reversing outright defendant's conviction for unlawful possession of a firearm by a street gang member. See 2022 IL App (2d) 200195, ¶ 77.

¶ 88 CHIEF JUSTICE THEIS joins in this special concurrence.